HOLIDAY WHOLESALE GROCERY
CO., et al., Plaintiffs,

v.

PHILIP MORRIS, INC.,
et al., Defendants.

No. 1:00–CV–0447–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 11, 2002.

Alexander Jackson Simmons, Jr., Jason Wayne Graham, Schreeder Wheeler & Flint, Atlanta, GA, for Movant.

Martin D. Chitwood, Nikole M. Davenport, Atlanta, GA, Dianne M. Nast, phv, Roda & Nast, Lancaster, PA, Stanley M. Chesley, phv, Waite Schneider Bayless & Chesley, Cincinnati, OH, for Plaintiffs.

W. Ray Persons, Matthew James Calvert, Hunton & Williams, Atlanta, GA, Ann Moriarty Galvani, phv, Robert Jeffey Dwyer, phv, Boies Schiller & Flexner, Armonk, NY, Kenneth L. Chernof, phv, Monica P. Medina, phv, Heller Ehrman White & McAuliffe, Washington, DC, Michael T. Williams, phv, Carlos Solis, phv, Darryl L. Snider, phv, Heller Ehrman White & McAuliffe, Los Angeles, CA, David J. Bailey, Jones Day Reavis & Pogue, Atlanta, GA, Joseph Bernard Haynes, Cheri A. Grosvenor, King & Spalding, Antlanta, GA,

Barack S. Echols, phv, Colin R. Kass, Kirkland & Ellis, Chicago, IL, Emmet J. Bondurant, II, Edward Bryan Krugman, Timothy S. Rigsbb, Bondurant Mixson & Elmore, Atlanta, GA, for Defendants.

## *ORDER*

FORRESTER, District Judge.

This matter is before the court on Defendant R.J. Reynolds' motion for summary judgment [170–1]; Defendant Brown & Williamson's motion for summary judgment [171–1]; Defendant Lorillard Tobacco Company's motion for summary judgment [173–1]; and Defendant Philip Morris' motion for summary judgment [174–1].

### I. BACKGROUND

#### A. Plaintiffs' Complaint

Plaintiffs are wholesalers and/or distributors that purchase cigarettes directly from Defendants Philip Morris, Inc. ("Philip Morris"), R.J. Reynolds Tobacco Co. ("RJR"), Brown & Williamson Tobacco Corp. ("B & W"), and Lorillard Tobacco Co. ("Lorillard"). In 1994, B & W acquired most of the brands of American Tobacco Co. For the purposes of this litigation, the court refers to both as "B & W." Although not named as a Defendant in this litigation, Plaintiffs allege that Liggett Group, Inc., also participated with Defendants in the alleged conspiracy. *See* Second Amended Complaint, ¶ 27. Named Plaintiffs are Buffalo Tobacco Products, Inc.; F & F Vending Service, Inc.; Holiday Wholesale Grocery Co.; Amsterdam Tobacco Corp.; Boro Park Tobacco; Sunrise Candy & Tobacco Corp.; I. Goldshlack Company; Suwanee Swifty Stores, Inc. D.I.P.; Marcus Distributors, Inc.; Hartz Foods; and Wichita Tobacco and Candy Co.[1] Plaintiffs' complaint alleges

---

1. Named Plaintiff ROG–GLO, Ltd. was voluntarily dismissed without prejudice because it no longer met the criteria to be a class representative. *See* Order, June 20, 2001.

that from a period beginning as early as November 1, 1993, Defendants engaged in a conspiracy to raise, fix, stabilize, and maintain the price of cigarettes in the United States at artificially high and noncompetitive levels.

## B. Procedural History

On February 18, 2000, a lawsuit was filed in this court alleging antitrust violations against several tobacco companies. After several additional suits were filed, the Judicial Panel on Multidistrict Litigation transferred four additional similar actions to this court. Plaintiffs filed an amended consolidated class action complaint on June 28, 2000 ("First Amended Complaint"). In sum, the First Amended Complaint alleged that Defendants conspired illegally to fix the wholesale prices of cigarettes in the United States during the period from November 1, 1993, to the present. Plaintiffs based the First Amended Complaint on section 4 and section 16 of the Clayton Act, and the alleged conspiracy was said to violate section 1 of the Sherman Act. The First Amended Complaint also asserted that Defendants fraudulently concealed their price-fixing conspiracy, thereby tolling the four-year statute of limitations generally applicable to federal antitrust actions.

Thereafter, Defendants moved to dismiss Plaintiffs' allegations of fraudulent concealment. In an order dated November 29, 2000, the court dismissed without prejudice Plaintiffs' allegations of fraudulent concealment for failure to satisfy the pleading requirements. The court also struck from the complaint as "evidence pleading" Plaintiffs' foreign market allegations pursuant to Federal Rule of Civil Procedure 12(f). Finally, the court dismissed Plaintiffs' allegations of non-price collusion to the extent they occurred prior to the initiation of the instant conspiracy.

On January 23, 2001, the court granted Plaintiffs' motion for class certification for the following class:

> All persons in the United States (excluding federal, state and local government entities and political subdivisions, and Defendants and their co-conspirators and their respective parents, subsidiaries and affiliates) that purchased cigarettes directly from one or more of the Defendants, or any parent, subsidiary or affiliate thereof, at any time from February 8, 1996 to February 8, 2000.

Order, January 23, 2001, at 13.

On February 22, 2001, the court granted Plaintiffs' motion for leave to file an amended complaint, the "Second Amended Complaint." Defendants again moved to dismiss Plaintiffs' allegations of fraudulent concealment and any claims for relief outside the four-year limitations period. The court dismissed those of Plaintiffs' claims in the Second Amended Complaint barred by the four-year limitations period. *See* Order, June 20, 2001. On February 8, 2002, all Defendants filed motions for summary judgment. The court heard oral arguments on Defendants' motions for summary judgment on April 23, 2002, and permitted the parties additional, limited briefing after oral argument.

## C. Facts Relevant to Motions for Summary Judgment [2]

Defendants sell cigarettes to direct customers, most often wholesalers, who then sell them to retail outlets. Facts, ¶ 7. Defendants' wholesale price lists are published to direct customers and are quickly a matter of public knowledge. *Id.,* ¶ 8. Wholesalers set the prices for their sales

---

**2.** Unless otherwise noted, the facts are taken from those presented in Defendants' Joint Statement of Undisputed Material Facts ("Facts") and admitted by Plaintiffs.

of cigarettes to retailers, and retailers set the prices for their sales of cigarettes to consumers. *Id.*, ¶ 9 and Resp., ¶ 9.

Generally, there are several "tiers" of cigarettes sold in the United States, including premium and discount cigarettes. *See* Expert Report (Defendants') of Dr. Kenneth G. Elzinga ("Elzinga Report"), at 30.[3] Discount cigarettes are priced below premium brands. *Id.* Cigarette companies also manufacture "deep discount" cigarettes, including private label or generic cigarettes, which are priced lower than discount cigarettes. *Id.* Prior to the beginning of 1993, the market share of discount and deep discount cigarettes increased from less than 1% of all cigarettes sold in the United States in 1980 to 33.0% in late 1992 and early 1993. Facts, ¶ 10. In particular, the market share of Marlboro, Philip Morris' premium brand, dropped from 27% in the middle of 1992 to 24% at the end of the same year. Marlboro's share further declined to 21% at the beginning of 1993. *Id.*, ¶ 11. On April 2, 1993, Philip Morris announced a nationwide promotion on Marlboro cigarettes that reduced prices at retail by approximately 40¢ per pack. *Id.*, ¶ 13. This announcement became known in the industry as "Marlboro Friday." *Id.* RJR, B & W, and Lorillard responded by initiating similar promotions. *Id.*, ¶ 14. Philip Morris announced further decreases in price to take effect on August 9, 1993. *Id.*, ¶ 15 and Resp., ¶ 15. As a result of Philip Morris' price decreases, the "price gap" between its premium and discount brands was reduced. *Id.*, ¶ 17. RJR matched Philip Morris' August 1993 price reductions and eliminated the price differential between its 85 millimeter and 100 millimeter cigarettes. *Id.*, ¶ 16 and Resp., ¶ 16. B & W and Lorillard instituted similar list price decreases. *Id.*, ¶ 18.

Thereafter, during the time of alleged conspiracy, the following price increases took place:

| Date of First Announcement | Amount of Increase |
| --- | --- |
| November 8, 1993 | $ 2.00 per thousand (4¢ per pack) |
| May 4, 1995 | $ 1.50 per thousand (3¢ per pack) |
| April 8, 1996 | $ 2.00 per thousand (4¢ per pack) |
| March 6–20, 1997 [4] | $ 2.50 per thousand (5¢ per pack) |
| August 29, 1997 | $ 3.50 per thousand (7¢ per pack) |
| January 23, 1998 | $ 1.25 per thousand (2.5¢ per pack) |
| April 3, 1998 | $ 2.50 per thousand (5¢ per pack) |
| May 8, 1998 | $ 2.50 per thousand (5¢ per pack) |
| July 31, 1998 | $ 3.00 per thousand (6¢ per pack) |
| November 23, 1998 | $22.50 per thousand (45¢ per pack) |
| August 27, 1999 | $ 9.00 per thousand (18¢ per pack) |
| January 14, 2000 | $ 6.50 per thousand (13¢ per pack) |

*Id.*, ¶ 26.

### D. Plaintiffs' Theory of Conspiracy

Plaintiffs assert that the "economic mar-

**3.** Premium brand cigarettes are sometimes called "full revenue" or "FR" brands, while discount cigarettes are referred to as "value for money" or "VFM" brands.

**4.** On March 6, 1997, RJR announced a list price increase of $2.00 per thousand (4¢ per pack). Shortly thereafter, Lorillard, Liggett, and B & W matched that increase. On March 20, 1997, Philip Morris announced a price increase of $2.50 per thousand (5¢ per pack). The other manufacturers then met Philip Morris' higher increase. *Id.*, ¶ 26 n. 4.

ket structure of the cigarette industry is highly conducive to collusion" because four companies control 95% of the market and cigarettes are fungible and highly inelastic. Plaintiffs also contend that the industry has faced the "increasingly-desperate" times in the past several decades. Plaintiffs' Response to Defendants' Motions for Summary Judgment ("Pls.' Resp.") at 67. With this context in mind, Plaintiffs note that the popularity of discount cigarettes rose in the early 1990s, resulting in RJR and B & W gaining market share by focusing on the discount market.

In response, Philip Morris drastically reduced the prices of its cigarettes on Marlboro Friday in April 1993. Plaintiffs contend this reduction was taken in order to "restructure the market to make it more conducive to a collusive arrangement." *Id.* Plaintiffs assert that the remaining Defendants ultimately decided to end the price war and agree to increase all prices. Plaintiffs argue that the most significant anti-competitive acts occurred during the formation of the cartel in 1993 and 1994.

Plaintiffs contend Defendants formed the cartel by "signaling" their willingness to accept an offer made by Philip Morris. Through Gary Black, an industry analyst, Defendants communicated the specific conditions necessary for a price increase, who would be the price leader, and Philip Morris' final signal that its conditions for the cartel had been met. Plaintiffs further assert that Defendants consolidated the price tiers between premium and discount cigarettes in order to make the conspiracy easier to form and monitor. Plaintiffs argue that Defendants had numerous opportunities to conspire through Committee of Counsel meetings at the Tobacco Institute and negotiations in 1997 and 1998 leading to settlements of the individual state healthcare lawsuits against the cigarette manufacturers and the Master Settlement Agreement ("MSA") covering multistate lawsuits. Plaintiffs also contend that the restriction of pricing authority to the highest ranking officers of the companies facilitated Defendants' conspiracy. Plaintiffs argue that these officials were able to discuss the future pricing of cigarettes during settlement negotiations.[5]

Plaintiffs also argue that in the fall of 1993, three of the four Defendants implemented a "permanent allocation" system

---

5. In their Second Amended Complaint, Plaintiffs asserted that the testimony of Lawrence Meyer, an outside counsel for Liggett, in litigation in the state of Washington would show that Defendants implemented the conspiracy through the Committee of Counsel. *See* Second Amended Complaint, ¶ 78c, at 34–35. Plaintiffs also contended that Mr. Meyer testified that the timing and level of price increases was discussed at Committee of Counsel meetings. *Id.,* ¶ 79, at 41.

Plaintiffs do not discuss Mr. Meyer's Washington state deposition testimony in their response to Defendants' motions for summary judgment, and, thus, its present relevance to this litigation is unclear. Plaintiffs, however, do cite this testimony in response to one of Defendants' Statement of Undisputed Material Facts. *Id.,* ¶ 37 and Resp., ¶ 37. There, Plaintiffs argue that Mr. Meyer testified he attended a Committee of Counsel meeting where there was a discussion of whether there had been a price increase and of how to respond to wholesalers who engaged in "trade loading." Regardless of what Mr. Meyer testified to in the Washington state litigation, such testimony could not support Plaintiffs' claims here because Mr. Meyer testified in this litigation that he stopped attending Committee of Counsel meetings in 1983, prior to the alleged initiation of the conspiracy at issue in this litigation. *See* Meyer Depo., at 79. The discussions about allocations Mr. Meyer recalled in his Washington state deposition occurred in the late 1970s. *Id.* at 112. Mr. Meyer also testified that there were never any discussions of setting prices at the Committee of Counsel meetings. *Id.* at 68–70. Nor was there a discussion among representatives of the cigarette companies to agree to impose allocations on wholesalers. *Id.* at 82.

that was intended to stabilize cigarette prices by limiting supply. Plaintiffs contend that Defendants agreed to exchange information about the quantity of cigarettes sold by brand, size, type, discount, and geographic information in order to monitor that all Defendants were complying with the agreement to fix prices. Plaintiffs aver that the collecting and sharing of such information are against the economic self-interest of each company. As part of the cartel agreement, Plaintiffs contend that RJR and B & W abandoned their strategy of focusing on the discount market, acts also inconsistent with their economic self-interest.

Plaintiffs point to other actions taken by Defendants that were against their economic self-interest. For example, Plaintiffs note there was little internal analysis done by each company about whether to follow a competitor's price increase. Similarly, Plaintiffs contend that Defendants employed "credit memos" when making price increase announcements which Plaintiffs aver delayed the impact of the price increase, so that all other Defendants could "accept" the price increase "offered" by the price leader. Plaintiffs argue that Philip Morris and RJR raised prices in May 1995 after internal recommendations by both companies indicated that they should not raise prices. Finally, Plaintiffs argue that Philip Morris took actions against its economic self-interest by agreeing to pay settlement costs in the M.S.A./Pittsburgh based on market capitalization rather than market share.

## II. STANDARDS FOR SUMMARY JUDGMENT [6]

■ Contracts or conspiracies to fix prices are illegal *per se* under section 1 of the Sherman Act. *See* 15 U.S.C. § 1; *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Although Plaintiffs and Defendants dispute the subtleties of the standards for summary judgment in an antitrust case involving an oligopoly,[7] the court finds that *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir.1998), clearly establish the standards in this circuit. Plaintiffs assert that "the understanding [among the conspirators] may consist of little more than shared expectations of conduct by persons with common objectives." Pls.' Resp., at 17. The court finds this speaks far too broadly for the law and focuses instead on the analysis in *Matsushita* and *Harcros*.[8]

---

6. The court is very mindful that this case is before it on motions for summary judgment and that it may not supplant a jury's function if it finds a dispute of material fact in the admissible evidence. Although there is much discussion herein of the evidence, the court has been careful to limit its evaluation of the evidence to whether allowable inferences are or are not created under the various standards.

7. There is no dispute that the cigarette industry in the United States is an oligopoly. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227–30, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); Expert Report (Plaintiffs') of Dr. Franklin Fisher ("Fisher Report"), ¶ 137.

8. Plaintiffs' proposition of the law would encompass the activities of even lawfully operating oligopolies. Plaintiffs cite *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), to support this proposition, but *American Tobacco* speaks far more narrowly. There, the Court held that "[n]o formal agreement is necessary" because a conspiracy could be shown by demonstrating "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Id.* Even under this statement of the law, Plaintiffs still must show some kind of agreement.

## A. *Matsushita*

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court addressed the standards governing motions for summary judgment in the antitrust context. There, the Supreme Court instructed:

> On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion. But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment ..., a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.

*Id.* at 587–88, 106 S.Ct. 1348 (internal quotations and citations omitted).

■ The Court further stated that "courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct." *Id.* at 593, 106 S.Ct. 1348. Thus, "if the factual context renders [the nonmovants'] claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587, 106 S.Ct. 1348. The Court recognized that "[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational economic motive to conspire, and if their

conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* at 596–97, 106 S.Ct. 1348. The Court went on to state that "[w]e do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Id.* at 597 n. 21, 106 S.Ct. 1348.

## B. *Harcros*

■ In *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir. 1998), the Eleventh Circuit extensively discussed the application of *Matsushita* to alleged conspiracies in an oligopolistic context. First, the court described the nature of evidence at the summary judgment stage:

> It is settled law that a threshold requirement of every antitrust conspiracy claim, whether brought under section 1 or section 2 of the Sherman Act, is "an agreement to restrain trade. To prove that such an agreement exists between two or more persons, a plaintiff must demonstrate 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"
> ... "We recognize that it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators ... and from other circumstantial evidence (economic and otherwise), such as barriers to entry and other market conditions."

*Id.* at 569 (quoting *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir.1991)). The court then reiterated the instructions of *Matsushita* described above. While rejecting a reading of *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1534 n. 4 (11th Cir.1987), that would require a plaintiff to "exclud[e] the possibility of independent action on the part of the defendants," the court reaffirmed *Matsushita*'s requirement that the plaintiff must show "that an inference of conspiracy is reasonable." *Id.* at 571 n. 35 (citations omitted). *See also In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir.1999) ("in drawing favorable inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices") (citation omitted). Thus, "conduct which is as equally consistent with permissible competition as it is with an illegal conspiracy does not, without more, support even an inference of conspiracy." *Harcros,* 158 F.3d at 571 n. 35 (citation omitted).

■ Applying these standards to the economic circumstances presented in *Harcros,* the court defined an oligopolistic market as "a market in which the dominant participants ... engag[e] in interdependent or parallel behavior and [have] the capacity effectively to determine price and total output of goods or services." *Id.* at 570 n. 32 (citation omitted). "Conscious parallelism" is a "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Id.* at 570 (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)).

■ Then the court noted:

[I]t is well settled in this circuit that evidence of conscious parallelism [alone] does not permit an inference of conspiracy unless the plaintiff [either] establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest ... or offers other "plus factors" tending to establish that the defendants were not engaging merely in oligopolistic price maintenance or price leadership but rather in a collusive agreement to fix prices or otherwise restrain trade.

*Id.* at 570–71. In sum, the court found that "the plaintiffs first must produce evidence showing that the defendants engaged in consciously parallel action. Second, the plaintiffs must show 'plus factors' that tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism." *Id.* at 572.

■ Additionally, the Eleventh Circuit has determined that even when a plaintiff proffers evidence of "plus factors," these "only create a rebuttable presumption of a conspiracy which the defendant may defeat with his own evidence; this further ensures that unilateral or procompetitive conduct is not punished or deterred." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 n. 30 (11th Cir.1991). The court is also mindful that it must consider the evidence presented by Plaintiffs as a whole and that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

Plaintiffs misapprehend the standards for summary judgment in the antitrust context on several occasions. Plaintiffs contend that "Defendants bear the burden

of proving that there is no set of facts from which a reasonable juror could find that defendants engaged in a conspiracy to raise, maintain and/or stabilize prices in the cigarette industry." *See* Plaintiffs' Reply to Defendants' Joint Post–Argument Memorandum ("Pls.' Post–Argument Reply"), at 11. It is unsurprising that Plaintiffs offer no citation for this "standard." As an initial matter, Defendants generally do not bear the burden of proof in a civil suit. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 387, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("In a typical civil suit for money damages, plaintiffs must prove their case by a preponderance of the evidence."). Furthermore, even if Plaintiffs are referring to the proof that must be presented at the summary judgment stage, their assertion still misses the mark. *Harcros* specifically holds that "conduct which is as equally consistent with permissible competition as it is with an illegal conspiracy does not, without more, support even an inference of conspiracy." 158 F.3d at 571 n. 35 (citation omitted). This is directly contrary to Plaintiffs' statement of the law. *See also Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348 ("To survive a motion for summary judgment ..., a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.") (internal citation omitted).

▮ Plaintiffs also contend that "[c]ontrary to [D]efendants' implications, interdependent oligopolistic behavior is not what the antitrust laws were designed to protect ...." *See* Plaintiffs' Post–Argument Reply, at 2 n. 2 (noting that antitrust laws were written to protect competition which benefits consumers). The court finds this to be an incorrect statement of the law. The law specifically recognizes that interdependent oligopolistic behavior is *not* prohibited by antitrust laws. *See Harcros,* 158 F.3d at 571 ("The require-

ment of 'plus factors' is necessary because evidence of consciously parallel behavior alone leaves the circumstantial evidence of collusion in equipoise; consciously parallel behavior by oligopolists does not in itself support an inference of agreement, of 'a meeting of the minds,' any more strongly than it supports an inference of legal price maintenance or leadership."). In fact, the law is careful in the proof it requires in a circumstantial case precisely because it wants to "ensure[ ] that unilateral or procompetitive conduct is not punished or deterred." *Todorov,* 921 F.2d at 1456 n. 30; *see also Matsushita,* 475 U.S. at 594, 106 S.Ct. 1348 ("mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect").

▮ Finally, at oral argument and in subsequent briefing, Plaintiffs argued that summary judgment in this case is governed by "boiler plate" provisions used by courts in all summary judgment contexts. *See* Transcript of Oral Argument, April 23, 2002 ("Oral Argument"), at 41–42. *Matsushita* and *Harcros,* however, demonstrate conclusively that the inferences that can be drawn on summary judgment are limited in the antitrust context. *See Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348; *Harcros,* 158 F.3d at 570–71. For the same reason, Plaintiffs' citation to *WSB–TV v. Lee,* 842 F.2d 1266, 1270 (11th Cir.1988), and *Augusta Iron & Steel Works v. Employers Insurance of Wausau,* 835 F.2d 855, 856 (11th Cir.1988) (per curiam), are inapposite. *See* Plaintiffs' Post–Argument Reply, at 4 & n. 3. Although Plaintiffs rely on *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 906 F.2d 432, 438–39 (9th Cir.1990), to support their contention that summary judgment is inappropriate, the Ninth Circuit has held that particular analysis in *Petroleum Products* to be dicta. *See In re Citric Acid Litigation,* 191 F.3d 1090, 1096 (9th Cir.1999) ("[Plaintiff] cites only a sin-

gle case, *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 906 F.2d 432 (9th Cir.1990), in support of its proposed legal standard. The plaintiffs in that case, however, presented *direct* evidence of conspiracy, *see id.* at 456–57, 459–60 n. 22, thus making dicta any discussion therein of the standard applicable when plaintiffs rely exclusively on circumstantial evidence.") (emphasis in original).

The court, however, has an obligation to consider summary judgment as it relates to this case in light of the more traditional summary judgment standards. The court applied the following thoughts when considering Plaintiffs' presentation and analyzing the circumstantial evidence and "plus factors" put forward by Plaintiffs. It seems to the court that the law has developed so as to provide very little guidance to determine when an inference is reasonable. As this circuit has said, the line is ephemeral. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1325–26 (11th Cir.1982). It has backed away from a rule that circumstantial evidence must exclude other hypotheses. Given the tension between a straightforward reading of *Matsushita*, which announces that more is required of inferences in antitrust cases than in run-of-the-mill cases[9] and the more standard summary judgment analy-

sis, the court believes it proper to consider what are allowable inferences of an "expressed, manifested agreement," *In re High Fructose Corn Syrup*, 295 F.3d 651, 653–54 (7th Cir.2002) (Posner, J.), that Plaintiffs may rely upon to defeat summary judgment.

 To begin with, it is clear that to create an issue of fact the inference must be "allowable" or "reasonable." *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir.1996) ("a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests"). To assure itself and the parties that the court's judgment on whether a piece of evidence can be admitted as relevant because it creates a reasonable inference, the court here sets out the principles to which it has resorted. First, the import of the piece of circumstantial evidence must actually be of the import that is ascribed to it by Plaintiffs. If, when considered in its entirety, it is totally ambiguous or to the opposite effect, it is not relevant and may not be relied upon by the jury.

 In dealing with allowable inferences, the court to a large degree is concerned with relevancy—that is, whether it makes a fact of consequence more or less likely. *See* Fed.R.Evid. 401.[10] In this

---

9. *Cf. Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992):

 The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that de-

cision. If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

*Id.* at 468–69, 112 S.Ct. 2072 (footnote omitted).

10. It is, of course, the court's responsibility to determine the admissibility of evidence. *See* Fed.R.Evid. 104(a) ("Preliminary questions concerning ... the admissibility of evidence shall be determined by the court ...."). In making this determination, the existence of certain conditions must be found by the judge. *See id.*, advisory committee's note. Whether an inference is allowable is really a

case, this means that evidence is relevant to Plaintiffs' position if it makes it more likely that Defendants had an express agreement to fix prices. Circumstantial evidence does not become relevant simply because it can be used by a skilled advocate to persuade a jury that there was an agreement. Persuasion can sometimes be achieved by appeals to prejudice, but that utility does not make the race, ethnicity, or gender of a defendant's employees relevant in a contract dispute, for example, and any inference drawn therefrom would not be allowable.

 It is said that an inference is unreasonable if a jury must engage in speculation and conjecture to such a degree as to render its finding "a guess or mere possibility." *Daniels*, 692 F.2d at 1325–28. From this statement, the court extracts the idea that the inference must directly and necessarily follow in the context of the case. Judge Posner had a variety of statements from competitors in *In re High Fructose Corn Syrup*. One was: "What are you going to tell [the president of Coca–Cola], that we gotta [i.e., have a] deal with ... our two biggest competitors ...?" *See* 295 F.3d 651, 662–63. Among possible inferences, this statement points directly at the one of consequence, and a jury may reasonably find that is so without a high degree of conjecture. On the contrary, a statement by a Philip Morris employee that if Philip Morris raises prices, the other companies will follow does not directly and necessarily point to the existence of an express agreement. First, the statement does not itself connect the prediction to an agreement.

Second, given what is known of oligopolies and conscious parallelism, the fact that the statement was made does not evidence a likelihood that an express agreement existed, and to reason from this statement to that point requires a guess based on mere possibility. Such an inference would be unreasonable.

 Finally, an inference would be unreasonable if it is reached through fallacious reasoning. For more than 2500 years, logicians have concerned themselves with sound and unsound means of reaching a truth. Over time, a number of fallacious arguments have been identified as not productive to learning the truth. One fallacy is called *ad hoc ergo propter hoc* (with this, therefore because of this); another is called hidden complexity. The inference urged from the prediction about competitors' price actions relies on the first of these fallacies and suffers from the second. From the fact that the statement was made, it might be claimed that the cause must be that there is an express agreement, of which the speaker has knowledge, to fix prices. We also know that in the context of this case, however, there are a number of other factors which might have caused the statement to have been made; yet, they are not accounted or controlled for. In *Daubert*, the Supreme Court approved a gatekeeping function for the court in making admissibility determinations based *inter alia* on sound methodologies. So long as the testimony was deemed admissible, the court did not draw its own conclusions about the testimony. In this context, it likewise seems appropri-

question of whether it is admissible under Rule 401. To determine its admissibility, the court may have to act as a fact finder. *See* Fed.R.Evid. 104(a) advisory committee's note ("To the extent that these inquiries [about the existence of conditions] are factual, the judge acts as a trier of fact. Often, however, rulings on evidence call for an evaluation in terms of

a legally set standard.... These decisions, too, are made by the judge."). As a fact finder, the court must determine, for example, whether an inference is a product of legitimate methodology or whether the evidence tends to make the existence of a fact that is of consequence more or less probable. *See* Fed. R.Evid. 401.

ate for the court to consider whether or not arguments are fallacious to determine whether inferences therefrom are allowable because fallacious reasoning is akin to unsound methodology. Keeping inferences reached only by logical fallacy from the jury is consistent with this understanding of the gatekeeper role of the court.

■ Plaintiffs have resisted Defendants' motions for summary judgment on the basis of parallel pricing and "plus factors." Conscious parallelism and "plus factors" can be a formulistic expression which does not capture the reality of the case. A "plus factor," therefore, needs to have some substance in order to tilt the balance. Merely labeling something a "plus factor" does not make it so, and a weak "plus factor" is not sufficient to withstand a motion for summary judgment because the "plus factor" analysis is really a surrogate for looking at a case in its entirety. It is well to say here that the distinct flavor of evidence before the court points to the absence of an agreement among Defendants and the presence of a great deal of uncertainty and anxiety about the future state of the market. *See infra.* The court also cautions that observers of this case need to know that unlike the usual case, one cannot place a great deal of faith in the fact that the *probata* will support the *allegata.*

## III. DISCUSSION

### A. Direct Evidence

■ Before reviewing the circumstantial evidence presented by Plaintiffs, the court considers Plaintiffs' allegation that they can show direct evidence that Defendants have engaged in illegal price fixing. Plaintiffs assert that in the 1990s, in response to health care lawsuits brought by various state attorneys general, Defendants conducted a joint defense and attempted to settle the cases. Plaintiffs describe a proposed settlement that would

have required Congressional approval and had a provision that settlement costs be passed through to consumers as price increases. Plaintiffs further proffer that the settlement failed when Congressional approval was not received.

Plaintiffs assert the mere fact that Defendants "discussed specific price increases in connection with the proposed Congressional Resolution," Pls.' Resp., at 28, is direct evidence of collusive behavior. The court disagrees. As an initial matter, it is likely that Defendants' negotiations would be protected under the *Noerr–Pennington* doctrine. *See A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239 (3d Cir. 2001) (holding that cigarette manufacturers were entitled to immunity under *Noerr–Pennington* for agreement settling tobacco tort litigation with numerous states). Furthermore, Plaintiffs' own presentation of evidence belies any notion of collusion. Plaintiffs cite deposition testimony from Geoffrey Bible, Chairman and CEO of Philip Morris Companies. In a document sent to executives of other cigarette companies describing the type of final settlement agreement sought by the industry, Mr. Bible indicated that an agreement in principle had been reached to allocate payments according to market capitalization. Mr. Bible then breaks down the annual payment of $15 billion into a price per pack charge of $0.60 for each of the companies. *See* Bible Depo., at 92, Ex. 2123. Such a payment methodology is akin to an excise tax, which is generally passed through to the customer, because it is based on the output level. *See* Elzinga Report, at 12. The document itself, however, reflects no price-fixing conspiracy, and Plaintiffs fail to associate it with any. As a whole, the statement merely provides a contextual understanding of the cost of the settlement on a per-pack basis.

In fact, Mr. Bible testified that he recalled the negotiating position of the state attorneys general to be that "any payments that were made to resolve the issues would be passed on in pricing because they [state attorneys general] wanted to see cigarettes priced higher to dissuade underage youth from buying cigarettes." Bible Depo., at 87–88. Mr. Bible understood that in order to accommodate this negotiation demand, some kind of legislation would be required in order to provide antitrust immunity. *Id.* at 88. The calculation of the cents per pack increase, therefore, was in the context of those government-sanctioned settlement discussions, which ultimately failed. *Id.* at 92–93. Because these initial settlement provisions were never implemented, they cannot form the basis for direct evidence of a price-fixing conspiracy.

Furthermore, Mr. Bible testified that once the subsequent M.S.A./Pittsburgh was reached without a provision for antitrust immunity, the companies ceased discussing prices in relation to the MSA. *See id.* at 93–94. Plaintiffs do not dispute Mr. Bible's testimony, but rather assert that the "fix" was already in because of Mr. Bible's previous comments concerning the costs of the settlement. As the court found above, however, this statement is not direct evidence of a price fixing agreement, particularly where it was made in the context of negotiating a global settlement that considered an option of antitrust immunity. Furthermore, the court finds it illogical that a statement made in 1997, four years after the initiation of the alleged conspiracy and related to a circumstance that could not have been anticipated in 1993, would be direct evidence of an alleged conspiracy engaged in by the companies since 1993.

■ Moreover, even if the court were to determine that Mr. Bible's statements could support an inference of conspiracy,

direct evidence must be "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food,* 166 F.3d at 118. An analysis of Mr. Bible's statements would require inferences to establish the proposition Plaintiffs assert.

Plaintiffs contend that they "were denied other discovery that may have provided additional direct evidence, such as Committee of Counsel notes, both because of the Court's discovery rulings and Defendants' refusal to produce such documents." Pls.' Resp., at 27 n. 11. Plaintiffs do not point the court to any particular rulings which have allegedly prejudiced them. In fact, the court notes that at a discovery hearing on November 20, 2000, Defendants agreed to produce the information requested in Plaintiffs' Interrogatory No. 18 concerning the identity of persons who attended Committee of Counsel meetings. Plaintiffs accepted that resolution of the discovery dispute. *See* Transcript of Hearing, November 20, 2000, at 65–66. Plaintiffs also agreed that certain document production would pertain only to those employees with authority to set price. Defendants averred that no one associated with the Committee of Counsel had authority to set price. Plaintiffs accepted that proffer. *Id.* at 86–88. Defendants further agreed to respond to Plaintiffs' Second Document Request Nos. 1 and 2, requesting any documents related to pricing discussions at the Committee of Counsel meetings. The court has located no motions to compel filed by Plaintiffs arguing that Defendants refused to produce this discovery. Accordingly, the court concludes that Plaintiffs were not hampered in their search for direct evidence by the discovery rulings of the court.

## B. "Plus Factors"

■ Because Plaintiffs have proffered no direct evidence of price-fixing, the court

proceeds to an analysis of the circumstantial evidence. As described in *Harcros*, in order to survive a motion for summary judgment, Plaintiffs must first produce evidence that Defendants engaged in consciously parallel behavior. Then, Plaintiffs must show "plus factors" that "tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism." 158 F.3d at 572. Here, no party disputes that price increases between November 1993 and January 2000 reflect conscious parallelism.[11]

### 1. Defining "Plus Factors"

Plaintiffs assert eleven "plus factors" to support their claim that Defendants conspired to fix prices: (1) signaling of intentions; (2) permanent allocations programs; (3) monitoring of sales; (4) actions taken contrary to economic self-interest, including (a) little analysis of whether to follow price increases, (b) B & W and RJR pulling away from the discount cigarette market, (c) the May 1995 price increase lead by RJR and followed by Philip Morris, (d) Philip Morris' agreement to base the initial M.S.A./Pittsburgh payments on market capitalization rather than market share, and (e) "excessive" price increases after the MSA; (5) nature of the market; (6) strong motivation; (7) reduction in the number of price tiers; (8) opportunities to conspire; (9) pricing decisions made at high levels; (10) the smoking and health conspiracy; and (11) foreign conspiracies. Although the court addresses each in turn, only the first four "plus factors" merit serious consideration.

■ Before analyzing the "plus factors" presented by Plaintiffs, the court notes that at turns, Plaintiffs use the terms "plus factors" and "facilitating devices" interchangeably. This practice confuses the proper analysis because "facilitating devices" are not necessarily suf-

---

**11.** Plaintiffs assert that in addition to the actual prices operating in parallel, Defendants also acted in parallel with respect to other terms of sale. Specifically, Plaintiffs argue that "credit memos" issued by Defendants at the same time as price increases were announced delayed the price increase "by allowing purchasers to continue to buy product at the old price for a period of weeks after the announcement." Pls.' Resp., at 26. Plaintiffs contend that the credit memos allowed each company to "offer" a price increase to the industry which rivals could accept or reject within the time allowed by the credit memo.

The only testimony Plaintiffs cite for their contention that credit memos delayed price increases fails to support this assertion. Plaintiffs assert that Carl Schoenbachler, former Chief Financial Officer of B & W, testified that the credit memos delayed the impact of the price increase for a week or more. *See* Pls.' Resp., at 26. As B & W responds, however, *see* B & W Reply, at 7 n. 8, a more complete reading of Mr. Schoenbachler's testimony shows that Plaintiffs' meaning cannot be attributed to his testimony.

Q: So, would I be correct, then, that one of the reasons for sending out the Telex

price increase sooner rather than later is to let the trade know that there is some period of time until the effective date, and during that—during which they have the opportunity to purchase at the old price?

· · · · ·

A: No, that's not what I said. The practice—more recent practice has been, when a Telex is sent out, the Telex states that the price increase is effective immediately. All goods ordered on Monday morning will carry the new price; you will be given a credit on a notional quantity that you purchased over the past six months on average, the average week's shipments over the past six months. So, there's no opportunity for the trade to order at the old price over some period of time.

Schoenbachler Depo., at 146. Furthermore, Defendants' price announcements took effect immediately, within one to two days of the announcement date. *See* PM Price Announcements, PM Reply Brief, Ex. 9; RJR Price Announcements; RJR Reply Brief, Ex. 36, at 58001 2713; Lorillard Price Announcements, Lorillard Reply Brief, Ex. 3.

ficient under the law to constitute a "plus factor." Plaintiffs allege that industry use of "facilitating practices" can increase the "likelihood of anticompetitive tacit coordination." Pls.' Resp., at 19. The court has found no case law, and Plaintiffs cite to none, which analyze the significance of "facilitating practices" as circumstantial evidence of price fixing in an oligopolistic market. In his antitrust treatise, late Professor Phillip E. Areeda states that a facilitating practice is "an activity that makes it easier for parties to coordinate price or other behavior in an anticompetitive way. It increases the likelihood of a consequence offensive to antitrust policy." Phillip E. Areeda, Antitrust Law, ¶ 1407, at 29 (1st ed.1986) (hereinafter "Areeda"). He further notes, however, that "it will often be difficult to establish causation in fact from a facilitating practice." *Id.*, at 32. "Facilitating practices" are "not customarily listed in the cases as a 'plus factor,' [but they] bear on the economic consequences of oligopoly ...." *Id.*, ¶ 1434e, at 221. Significantly, Professor Areeda does not believe that facilitating practices should transform an otherwise immune oligopoly into a conspiracy. *See id.*, ¶ 1436, at 248.

■ As discussed below, the court finds this interchange particularly significant when considering the testimony of Plaintiffs' main expert, Dr. Fisher, and whether he offered testimony that distinguished conscious parallelism from illegal cartel behavior. In order to constitute a "plus factor," an activity must "tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism." *Harcros*, 158 F.3d at 572.[12]

## 2. Signaling

■ Plaintiffs argue that (1) Defendants use signals to communicate with their competitors, (2) each Defendant knows its competitors monitor its signals, and (3) the signaling related to specific price increases. Specifically, Plaintiffs assert that each company would send a representative to its competitors' analyst presentations so that each Defendant knew such "signals" would be received. Plaintiffs further argue that Defendants used Gary Black, a tobacco industry analyst, as the conduit for these signals because Mr. Black would report on these meetings and other events in the tobacco industry. In sum, the court finds Plaintiffs' theory of signaling among the companies to be based on a combination of statements taken out of context, as well as ominous readings of typical industry reporting on strategy. To reach the inferences suggested would require the jury to engage in speculation and does not tend to exclude the possibility that Defendants acted independently.

■ "Signaling" is a pejorative term as used in this context. Its import is either that a competitor is inviting all to make a traditional price-fixing agreement, or that there already exists such an agreement and it is being carried out through indirect communications. Despite Plaintiffs' use of the word and the infusion of their brief with colorful terms of "nods" and "olive branches," Plaintiffs have done nothing more than show that in an oligopoly, each company is aware of the others' actions. This is the nature of the economic interdependence of the companies in an oligopoly. As Professor Areeda explained, in an oli-

---

12. In their Post–Hearing Submission in Opposition to Defendants' Motions for Summary Judgment, Plaintiffs dramatically point to a "recently" produced document to show Defendants "clearly understood the antitrust concerns raised by many of the practices that plaintiffs have identified as 'plus factors.' "

*Id.* at 12. A review of the document shows it to be a summary of antitrust law and the application of that law to the Tobacco Industry Testing Laboratory. The court finds this document has no relevance to the present litigation.

gopoly, "competing firms may be able to achieve cartel-like results for themselves simply by observing each other's behavior":

> Each firm's pricing decision is *interdependent* with that of its rivals: each knows that his choice will affect the others, who are likely to respond, and that their responses will affect the profitability of his initial choice. Each knows that expanding his sales or lowering his price will reduce the sales of rivals, who will notice that fact, identify the cause, and probably respond with a matching price reduction. Unless he can somehow conceal his price reduction, or unless his own position is improved by a lower market price, he will hesitate to reduce prices at all.

Areeda, ¶ 1410b, at 65 (emphasis in original) (footnote omitted); *see also* William A. McEachern, Economics: A Contemporary Introduction, at 523 (5th ed.2000) (in an oligopoly "[e]ach firm knows that any changes in its product quality, price, output, or advertising policy may prompt a reaction from its rivals. And each firm may react if another firm alters any of these features."); *In re Baby Food,* 166 F.3d at 128 ("In an oligopoly consisting of no more than three companies at one time and collectively controlling almost the entire market, there is pricing structure in which each company is likely aware of the pricing of its competitors.").

[24] Because in competitive markets, particularly oligopolies, companies will monitor each other's communications with the market in order to make their own strategic decisions, antitrust law permits such discussions even when they relate to pricing because the "dissemination of price information is not itself a *per se* violation of the Sherman Act." *United States v. Citizens & S. Nat'l Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). In *In re Baby Food,* the court granted summary judgment for the defendants despite the plaintiffs' argument that the defendants had communicated about pricing information. There, the court determined that sales employees of one defendant were required to report to their superiors any competitive information they learned from other sales representatives in the industry. *Id.* at 118–19. Sales representatives often learned of their own company's intention to increase prices before announcements were made. Thus, the court found, price information was systematically obtained and given to high level executives of each of the defendants, often before the pricing took effect. Nonetheless, the court granted summary judgment to the defendants because there was no evidence that these information exchanges had any effect on pricing decisions. *Id.* at 125. *See also Blomkest Fertilizer, Inc. v. Potash Corp.,* 203 F.3d 1028, 1036 (8th Cir.2000) ("evidence that the alleged conspirators were aware of each other's prices, before announcing their own prices, is nothing more than a restatement of conscious parallelism, which is not enough to show an antitrust conspiracy"); *United States v. General Motors,* 1974 Trade Cas. ¶ 75253 (E.D.Mich.1974) ("The public announcement of a pricing decision cannot be twisted into an invitation or signal to conspire; it is instead an economic reality to which all other competitors must react.") (cited in Areeda, ¶ 1435, at 228).

In contrast, the cases which have found that an inference of traditional agreement from indirect communications took place show far more detailed communications with no public purpose. *See In re Medical X–Ray Film Antitrust Litigation,* 946 F.Supp. 209, 213 (E.D.N.Y.1996) (noting companies exchanged internal competitive memos and citing specific testimony that representatives of Fuji and Agfa privately met to exchange pricing information); *Petroleum Proceedings,* 906 F.2d at 460–61

(noting that defendants exchanged supply and demand forecasts and internal analyses documents were found in the files of competitors). Here, Plaintiffs have documented nothing reaching the level of prohibited exchanges, but rather have described the type of information companies legitimately convey to their shareholders. Furthermore, numerous courts have recognized the difficulty involved in using "signaling" to form an agreement to fix prices where list prices are not the prices paid by individual customers. *See Brooke Group,* 509 U.S. at 217–18, 236, 113 S.Ct. 2578; *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.,* 971 F.2d 37, 53–54 (7th Cir.1992) (signals "would be, to put it mildly, an awkward facilitator of price collusion because the industry practice of providing discounts to individual customers ensured that list price did not reflect the actual transaction price" and rejecting plaintiff's claim that announcements of price increases thirty to sixty days in advance was evidence of collusion). Thus, Plaintiffs' description of "signaling" does not make it any more likely that Defendants had an agreement to fix prices and it is not relevant.

Plaintiffs first theorize that after issuing the "demand" of Marlboro Friday, Philip Morris waited to receive signals from the other Defendants that they would join the conspiracy. Plaintiffs contend that Philip Morris understood signaling because of

their response to the introduction of the 99–cent cigarette category in 1992.[13] Plaintiffs cite a 1992 document to show that Philip Morris "was well aware of the use that might be made of securities analysts to signal their competitors." Pls.' Resp., at 37. A full reading of this memo, however, shows that Philip Morris was looking to correct false reporting of a competitive strategy of retail rebates by sales people.[14] Accordingly, Plaintiffs' contention is without support in the record.

In any event, setting aside whether the companies understood how to "signal" one another, the court notes that it is difficult for such allegations to support an inference of conspiracy. *See Blomkest,* 203 F.3d at 1037 (where the plaintiffs contended that defendants signaled pricing intentions by circulating advance price announcements, court concluded that such evidence did not support an inference of price fixing because the plaintiff "may not proceed by first assuming a conspiracy and then setting out to prove it" ... only "[i]f the [plaintiff] were to present independent evidence tending to exclude an inference that the [defendants] acted independently," could the plaintiff use the signaling evidence for additional evidence of a conspiracy); *In re Baby Food,* 166 F.3d at 133 ("courts generally reject conspiracy claims that 'seek to infer an agreement from ... communications despite a lack of indepen-

13. *See* PMAT 000072883–2888, Board Notes, Wednesday, October 28, 1992. This document, however, explains a decision by Philip Morris not to enter the 99 cent category of cigarettes because "we felt this would have sent a conflicting message to our competition and damaged our chances of narrowing the price gap." *Id.* at 2884.

14. *See* PMAT 000205367 ("False reporting of a competitive strategy of retail rebates by sales people: This could very well be the case. This happens in other industries such as the pharmaceutical industry. One president and

CEO stated, 'When the sales department controls everything, the danger is that you become price driven because sales organizations look to sell things. A marketing office balances that tendency since he's responsible for profitability.' One way to resolve this problem is have sales report to an EVP of Marketing and Sales. Another suggestion is for Larry Wexler and/or Bill Campbell to increase the number and frequency of interviews with the trade press, local press (RH, Cabarrus), and security analysts, in order to send clear signals throughout the industry.").

dent evidence tending to show an agreement'").

Nevertheless, Plaintiffs assert Philip Morris "looked to the others to signal that they would play by the new rules." Pls.' Resp., at 39. Plaintiffs contend the "signals were not long in coming." *Id.* As discussed below, however, the allegation of Marlboro Friday as "invitation to collude," is not supported by the materials cited by Plaintiffs. Indeed, most of the incidents to which Plaintiffs refer occurred prior to the time Plaintiffs allege the conspiracy began—November 1993.

 Plaintiffs point to a statement made by BAT's CEO and Deputy Chairman, Martin Broughton, to the *Financial Times* on April 13, 1993, and argue that this is a signal that B & W would accept Philip Morris' "offer." Mr. Broughton stated, "BAT may be one of those who started the price war in the U.S., but we have no wish to escalate it." PMAT0300005506–5515, at 5510. As B & W points out, however, this excerpt is not the totality of Mr. Broughton's comments. Mr. Broughton's full comment was: "We may be one of those who started the price war, but we have no wish to escalate it. But we shall be ready to respond tactically where necessary." B & W Mot. S.J., at 21; Ex. D–3. The rest of the interview also notes that Mr. Broughton was "perplexed" by Philip Morris' tactics and that BAT "will wait to see what happens in the market before playing its own cards." *Id.* No reasonable jury could infer that B & W agreed to any particular future course of conduct from the entirety of this statement.[15]

Incongruously, Plaintiffs argue that "industry understanding began to coalesce" after Philip Morris *again* cut its prices on July 20, 1993. Pls.' Resp, at 40. Plaintiffs do not explain how an additional price cut by Philip Morris shows any previously existing industry-wide agreement to form a cartel to fix and raise prices. Yet some of the "signaling" contentions discussed by Plaintiffs are irrelevant unless such an agreement exists.

Similarly, Mr. Black's reporting of B & W CEO Thomas Sandefur's comments at a September 1993 BAT analyst meeting, does not support Plaintiffs' theory that Mr. Sandefur was signaling to Philip Morris

---

**15.** Plaintiffs' own expert seems to recognize the purpose of this kind of statement. Dr. Fisher testified that he believed there are "perfectly good reasons why [companies] would want to tell analysts, we are going to be profitable from now on." Fisher Depo., at 179. Dr. Fisher opines, however, Mr. Broughton's statements "seem to have gone somewhat beyond that." *Id.* He later testifies, however, that it would be preferable, meaning more "legitimate," for BAT to say something more akin to "we are sorry there's a price war" because "nobody likes price wars." *Id.* at 180. The court finds it is splitting hairs to conclude that Mr. Broughton's comments, read in their entirety evidence an agreement when Dr. Fisher agreed it was not surprising that Mr. Broughton would express displeasure at being caught in a price war.

Plaintiffs describe B & W's response to Marlboro Friday as an "olive branch." Pls.' Resp., at 40. Plaintiffs point to a document written on May 25, 1993, by an unnamed BAT employee asking, "Should we signal to PM that we are prepared to go up?" BAT303501037–042, at 039. It is claimed that this document refers to Philip Morris' new pricing strategy. A review of that document and Plaintiffs' brief, however, provides no context for that statement. The document is handwritten with no indication who authored it. As such, the document does not constitute admissible evidence. Furthermore, on the same page as the quote cited by Plaintiffs are possible actions BAT considers taking in France and Germany. Thus, it is likely the document does not even discuss pricing in the United States. Moreover, there is no indication that any public statement was made related to this internal memo. For all of these reasons, the document does not reflect the import ascribed to it by Plaintiffs in their "olive branch" theory.

that B & W would agree to Philip Morris' "demand" and no longer compete on price terms. Mr. Sandefur stated:

> We believe that price cutting or discounting—while still a factor—will be less important than in the past. That's because gaps in the list price have narrowed between premium and V–F–M [value for money] brands. Premium brands, therefore, should regain some strength. Over time, smaller price increases coupled with state and federal tax increases, will bring premium prices up once again. This will make V–F–M brands more appealing. But in the near term, value-for-money brands will need to compete on some basis other than price. *And our company fully intends to pursue options other than price for our V–F–M brands.*

588113496–573, at 511 (emphasis in original). This statement does not indicate that B & W will not compete on price. It explains that with Philip Morris narrowing the price gap and forcing a return to strength for premium brands, "in the near term," discount brands would have to come up with another way to compete. This statement is anything but a commitment to abandon price competition, as Plaintiffs allege. It is, in fact, a declaration of an intent to do so if and when the prices of premium brands are increased.

■ In their briefing and at oral argument, *see* Oral Argument, at 71, Plaintiffs then contend that Philip Morris looked to signal other companies. Plaintiffs' citation for this proposition, however, is an October 25, 1993 internal Philip Morris document from Geoffrey Bible to W.I. Campbell. *See* PMAT000144681–684, at 683 ("All of

the foregoing suggests a strategy of market share as opposed to profitability when in fact our current instincts are toward the latter, so why have I focused on share? Because I'm looking at fairly flat to modest share growth with the view towards caressing the competition into a 'profitability' mode."). As described by the court above in discussing summary judgment standards, a hope by one company that it can create a disincentive for its competitors to engage in price competition to the detriment of profitability is not evidence of a collusive agreement to fix prices.[16] Marlboro Friday taught a marketplace lesson that market share gains bought by discounting are not sustainable and that in the end, market share will be lost and profits severely shrunk if a strong competitor also engages in price cutting.

Plaintiffs point to few events of "signaling" that occurred during the alleged conspiracy period. Plaintiffs proffer that RJR signaled it would accept Philip Morris' "conditions for a price hike" on November 2, 1993, when RJR's CEO and CFO met with industry analysts. Pls.' Resp., at 44. However, Plaintiffs' assertion that RJR's CEO Charles M. Harper "was signaling that RJR would meet PM's conditions for a price hike," *id.,* is without support. On November 2, 1993, Harper stated that RJR was going to focus on earnings growth and was "willing to accept modest market share losses as the cost of improving earnings." PMAT3000005464–473, at 465. The whole objective of free enterprise is to earn a profit. This may be achieved by selling more units at a smaller profit or vice versa. Because of Philip Morris' actions, RJR lost market share

---

16. Furthermore, the *Brooke Group* Court indicated that measures such as what Philip Morris did on Marlboro Friday should not be punished under antitrust law even if "the ultimate effect of the cut is *to induce or reestablish supracompetitive pricing."* *Brooke Group,* 509 U.S. at 223–24, 113 S.Ct. 2578 .

(emphasis added). The court also observes that the strategy of mutually assured destruction was directed at "caressing" the former Soviet Union into a peaceful posture but by no means would one infer that it and the United States were conspiring together.

and, therefore, was left with but one realistic avenue to grow its profit: to raise prices. There is nothing ominous or collusive about this statement. It is typical of the statements made every day by corporate executives to industry analysts as a means of providing investors information on a company's future strategic marketings plans.

The court notes, furthermore, that Plaintiffs premise their theory of "conditions for a price hike" on statements made by Mr. Black, not industry executives.[17] As described below, however, Mr. Black could not have acted as a conduit for Defendants.[18]

■ Plaintiffs contend that Philip Morris' "final signal" was an announcement on November 4, 1993, of allocation limits for wholesalers. Plaintiffs argue that this was an indication that Philip Morris intended to raise prices and was a "nod" to RJR that Philip Morris would agree to a price increase. Pls.' Resp., at 46. A Philip Morris internal memo dated November 3, 1993, indicates a recommendation for a price increase as of December 15, 1993 and a product allocation program effective November 5, 1993. The memo explains that "[a]nnouncing the allocation program in November should curtail speculative buying and allow PM–USA to exercise some control in setting year end inventories." PM20451211128. There is nothing to suggest that Philip Morris is responding to RJR's willingness to move to a profitability mode except the temporal proximity of the two announcements. A complete review of the memo makes two things certain. First, Philip Morris had no idea that its competitors would react to a price increase and, to that end, had a competitive contingency plan.[19] Second, retail price actions were viewed by the manufacturers as a key part in competitive strategy. These varied concerns belie Plaintiffs' theory of an agreed-upon conspiracy.[20]

17. With regard to the "two conditions," Mr. Black testified that,

> This is my opinion—this is my opinion that, as an analyst, if a price increase were going to stick, this is how it would have to be structured. This is my opinion, you know, looking at industry pricing structure in the past in other price wars, that these are the conditions that, in my opinion, as an analyst, would have to be in order to become bullish on the group.
>
> If I saw a different type of price increase, I wouldn't become bullish because I would conclude that it wasn't going to stick. *This is not something that would have come from the industry. This is my own opinion.*

Black Depo., at 140–41 (emphasis added).

18. Plaintiffs cite document PM2023769230–232 for the proposition that "PM, too, appreciated from the clear implication of Harper's statements that RJR was willing to accept PM's conditions for a price hike." Pls.' Resp., at 44. A review of that document, however, shows it is a copy of a Gary Black industry report with some portions of the report underlined. It does not identify the "PM executive" Plaintiffs allege read these "signals" into RJR's statement, and thus, Plaintiffs' assumptions are based on mere speculation.

19. Significantly, far from being the final link in the conspiracy, the internal memo reflects Philip Morris' uncertainty about the market's reaction. *Philip Morris determined several possible risks from its strategy:* (1) a competitor would exceed Philip Morris' increase by $0.50 to $1.00, (2) a competitor would announce a price increase in advance of Philip Morris', (3) competitors could fail to raise prices in the low end of the market, and (4) *in the long term, competitors could initiate a mid-year price increase. Id. at 2045121129.*

20. Plaintiffs contend that the amount of RJR's announced price increase in November 1993 must have been agreed upon in advance because RJR's $2.00 increase matched the $2.00 suggested in Philip Morris' internal recommendation of November 3, 1993. As RJR notes, however, $2.00 price increases were common in the industry. *See* RJR Reply Brief, Ex. 38, Black Memo, October 21, 1993, at 4 ("most price increases have been ... $2.00–$2.50 per thousand").

Furthermore, at the time, industry analysts did not assume Philip Morris' allocation program was an indicator of a price increase. *See* Dean Witter Report, November 8, 1993, PM2023769202 (specifically rejecting notion that allocation was a "near-term indication of a pending price increase" and noting "[i]t is our belief that [the allocation program] was driven by the behavior of wholesalers who were attempting to replenish inventories in order to maximize cash flow and minimize taxes prior to the close of their fiscal year-end (most wholesalers' fiscal year ends on November 30 or December 31)"); Prudential Securities Report, November 8, 1993, PM2023769205 (rejecting assumption of price increase and noting "[w]e believe that this mailgram was sent to appease troubled wholesalers who have been financially hurt by the price war's price cuts that lowered the value of their inventories."); Smith Barney Shearson Report, November 8, 1993, PM2023769208 ("[W]hile this move by [Philip Morris] may indeed be the prelude to a general price hike it could also be just a method of reducing some excess inventory at the wholesale level").

Plaintiffs point to other documents to show that Philip Morris and RJR knew how to "signal" competitors. Geoffrey Bible's notes for a meeting with Gary Black indicate, in response to a potential question about share gains by other companies, that "[w]e consider it healthy competition when Lorillard grows Newport, or B & W grows Kool or GPC through normal promotional activities. However, we consider it provocative if share gains are sought through continuous price promotion." PMAT 000200976, Ex. 2119 to Bible Depo. As Mr. Bible testified, however, "to every action there's a market or competitive reaction. And so you always try to weigh your actions to minimize competitive reaction." Bible Depo., at 71. Mr. Bible's statement is nothing more than a recognition that Philip Morris intended to protect its market share, an intention already made clear by its actions on Marlboro Friday.

Remarkably, Plaintiffs assert that RJR learned the benefits of such market communication during a "war game" strategy session held in 1994 in response to Marlboro Friday. Such an event, however, belies Plaintiffs' illegal collusion theory. If RJR understood that Philip Morris was making an offer, as Plaintiffs contend, RJR would not need to conduct strategy games to determine how to respond to Philip Morris' overtures. *See* RJR 51962 5141–59, at 55–57. Thus, RJR's response does not reflect that RJR understood Marlboro Friday to be an "invitation to collude," as Plaintiffs allege. *See* Pls.' Resp., at 39–40. Plaintiffs portray the competitive event of Marlboro Friday as Philip Morris' opening "gambit" in demanding that other companies "play by the new rules." Pls.' Resp., at 39. But Plaintiffs fail to recognize that Marlboro Friday created a new competitive framework in the industry.

As the last feature of their signaling theory, Plaintiffs contend that Defendants used Black to "signal" on the following occasions: (1) in early October 1993, Black reported that Philip Morris and RJR removed coupons from their deep discount products and appeared willing to cede share to the "small players" at the low end; (2) Black predicted that for RJR to lead a price increase that Philip Morris would follow, the price increase would have to be for list prices of premium and discount by the same amount and the smaller companies would follow the increase on the deep discount brands; (3) Black reported that B & W would end most forms of discounting on its low price brands; (4) Black reported a statement by B & W CEO, Thomas Sandefur, Jr., on September

30, 1993, that the company intended to "pursue options other than price"; (5) Black reported that RJR would focus on profits rather than share; and (6) that Philip Morris was switching to a "market share strategy."

Plaintiffs place great weight on the reporting of Mr. Black in developing their "signaling" theory. For Plaintiffs to survive summary judgment on this as a "plus factor," there must be some evidence that one of the Defendants fed Mr. Black information that prices were about to rise, and it ought to appear that what he published could be relied on as a statement of intention from a conspirator.

Throughout his deposition, however, Mr. Black repeatedly denied getting any "inside" information from the cigarette companies; rather, Mr. Black used primarily his sources in the wholesale and retail market, as well as publicly-available information to make his market predictions. *See* Black Depo., at 20 ("Most of my contact with the tobacco companies was with the investor relations folks, whose job it is to talk to the analysts, talk to the investors, you know, about the stock price, about corporate profits, about strategies . . ."); at 40 ("I never viewed myself as being privy to anything that I was the only person seeing from the tobacco industry.");[21] at 40–41 ("Q: Weren't there times when you received from tobacco companies information that at least to your knowledge was being sent to you and not to others? A: No. Q: Never? A: I don't think so. That's not the way they were allowed to do business."); at 131–32 ("it was very taboo for the industry to talk about pricing, and they made that clear. Any analyst conference, anything, they would say it's taboo, we can't talk about pricing, so most of my sources were either from retail or from wholesale."); at 134–36 ("[p]ricing was a taboo topic [with the companies]" . . . "[w]hen I got information about pricing, whether it be from a wholesaler, a retailer, I would, of course, publish it . . . [pricing information] was very much coming from the field, not the manufacturers");[22] at 148 (testifying that his sources

21. Mr. Black repeatedly rejected Plaintiffs' "signaling" theory:

> Q: There is no dispute that from time to time [the companies] did talk about pricing and they did it quite openly, didn't they?
> MR. O'REILLY: Objection to the form. Vague.
> A: They would talk about pricing in the context of their cost structure, so that if costs were going up, whether it be promotional costs, litigation costs, there was obviously discussion about their economics.
> Q: And everybody understood what that meant, right, sir?
> MR. O'REILLY: Object to the form.
> A: I don't know what you mean.
> Q: Well, you understood it, didn't you? You understood, when their costs were *going up and they were signaling their* costs were going up, that meant they were talking about a price increase, right?
> A: No.

Black Depo., at 132.

22. Mr. Black repeatedly rejected Plaintiffs' counsel's insinuation that he was privy to inside information:

> Q: My question to you, sir, is what was the source of your information that RJR would likely lead the price increase and Philip Morris would follow?
>
> . . . . .
>
> A: The source was my understanding of how industries work, that when you have a player like RJR that you could argue caused the price war because it was gaining so much share in discount, Philip Morris cut price, RJR was now hurting because it had debt commitments that it had to make. I felt that RJR was desperate to try to pull the industry out of the price war. That's why I thought RJR would be the one that would lead it, but that was based on my own analysis as an outsider looking at the industry.
> Q: Isn't it true that you had additional information beyond just your own analy-

were retail); at 150 ("I spent my time talking to retailers, wholesalers, that's where I got most of my information."); at 167 ("there was no little bird telling me that [BAT was going to raise prices], but the theory would suggest that they would follow"); at 171 (denying that RJR was signaling to him that they wanted the price war to end and testifying that it was simply his opinion as a "financial analyst, I could look at the balance sheet and see that they were in trouble"); at 219–20 (testifying that he estimated a 5 to 6% price increase not based on information he received from the industry, but from his analysis of the level of pricing necessary to hit the profit targets investors expected from Philip Morris); at 243 (testifying he did not receive price announcements from the tobacco companies). There is no other evidence that he was being fed by Defendants.

Furthermore, even though Mr. Black made a few correct calls, he was a very unreliable messenger of industry "signals." *See* Affidavit of Dr. Darrell L. Williams, Philip Morris Reply Brief. Of the 257 analyst reports authored by Mr. Black for Sanford C. Bernstein & Co., Inc., from April 1993 through May 1999, there were 43 total price projections. *See* Williams

Aff., ¶¶ 2–3. Only 31 of those 43 projections specified an amount and date for the price change. *Id.*, ¶ 4. Of those 31 predictions, Mr. Black was correct on both amount and timing only 3% percent of the time; that is, only one of his 31 predictions was correct on both factors. *Id.*, ¶ 5. Specifically, between November 1993 and November 1994, the one-year period during which Plaintiffs allege that Defendants established the conspiracy through the use of Mr. Black as a signaling medium, Mr. Black incorrectly predicted a price increase *seven* times. *See* Williams Aff., Ex. 2; RJR Reply Brief, at 13 & n. 8. Prices did not increase until the following year in May 1995. *See id.* (noting additionally that even though Mr. Black predicted a May 1995 increase in March 1995, he then retracted that prediction on April 27 only days before the actual increase). Furthermore, even though Mr. Black retracted his March 1995 price prediction, Plaintiffs still assert that Mr. Black "read the signals" and predicted a 5% to 6% price increase in March 1995. In any event, Mr. Black's testimony makes it clear that the information he based this prediction on did not come from the industry.[23] He talked to people in "the trade," by which Mr. Black meant wholesalers and retailers, and

sis, that being RJR had announced publicly its interest in raising its profits?

A: No. That's not correct.
Q: You are sure?
A: I think I'm sure. RJR, during analyst meetings, would say, We would love to get our earnings up because we can't— we are going to have a hard time making our debt payments if this price war gets any worse. So, yes, RJR did say things like that, and RJR clearly wanted to get its earnings up, but RJR never said, Well, we are going to raise prices and Philip Morris is going to follow; that never happened.

Black Depo., at 138–39.

23. In response to Plaintiffs' counsel's question as to whether he received information from the industry, Mr. Black testified: "Not from the industry. It would come from the trade, from backing into what number—what level of pricing do you need to hit the profit targets that investors expected from Philip Morris." Black Depo., at 219–20. Despite Plaintiffs' counsel's exhortations, Mr. Black continued to testify that he did not receive price increase information from the industry.

Q: Well, nobody could tell you what the price hike would be other than the industry, correct?
A: That's incorrect. I could back into it myself what they needed to hit their profit targets.

*Id.* at 220, 113 S.Ct. 2578.

looked at the calendar while considering the history of price increases in the industry. Black Depo., at 218–19.

Because Mr. Black was so often incorrect in his predictions, Plaintiffs could not possibly show that his signals had an impact on pricing decisions, as is required to assert that "signaling" is a "plus factor." *See Blomkest,* 203 F.3d at 1034; *In re Baby Food,* 166 F.3d at 125. Accordingly, the court finds that the statements of Mr. Black cannot constitute a "plus factor" because they will not support a reasonable inference of co-conspirator "signaling." Mr. Black's reporting was typical of reporting which thousands of analysts perform on countless industries every day. In sum, the court finds that Plaintiffs' theories of "signaling" do not tend to exclude the possibility that Defendants were engaged in competitive conduct and, thus, cannot be "plus factors."

### 3. Imposition of Permanent Allocation Programs

Plaintiffs argue that Defendants implemented permanent allocation programs in the fall of 1993 to facilitate their conspiracy. Plaintiffs contend that such allocations programs limit product supply, an inherently anti-competitive act, and restrict output. Plaintiffs also argue that permanent allocation programs are against the independent economic self-interest of non-coordinating firms. Finally, Plaintiffs contend that Defendants' justifications for permanent allocation are "false."

These contentions are devoid of factual support. The conspiracy is said to have begun in November 1993. Only Philip Morris put a permanent allocation program in effect in that month. Lorillard had one in March 1990 and RJR and B & W put theirs in effect in September and October 1993. They all would have had to have been clairvoyant to foresee Philip Morris' November "signal." Further, the

programs did not effectively limit the wholesale market's ability to meet demand. Finally, the admissible evidence shows that the allocation programs were in the economic self-interest of Defendants.

Defendants effectively show that permanent allocation is economically rational because the prior system of no allocation or temporary allocation made it difficult for Defendants to determine true consumer demand, made inventories difficult to manage and unpredictable, and caused high levels of product returns due to staleness. Defendants further demonstrate that permanent allocation does not prevent increased allocation due to increased supply, but rather prevents wholesalers from speculating on inventory profits. Accordingly, there is no reasonable inference of an express and unlawful agreement from the implementation of an allocation program.

In the late 1980s and early 1990s, Defendants' direct customers engaged in "trade loading," a practice whereby the direct customers would purchase an amount of cigarettes in excess of what they could sell either (1) in anticipation of expected list price increases or (2) in response to end-of-quarter or end-of-year manufacturer discounts and incentives. Facts, ¶¶ 52–53. Plaintiffs admit that Defendants experienced increased costs due to trade loading because that practice would distort sales results and cause excess product returns, disruptions in shipping patterns, and stale product. *Id.,* ¶ 54.

Defendants have presented testimony and contemporaneous documentation to show that permanent allocation programs were initiated in response to trade loading concerns. B & W started a permanent system of purchase allocation restrictions in October 1993 called Expected Order Quantity ("EOQ"). B & W recognized the problems of trade loading as early as 1991. *See* B & W 1991–1995 Corporate Plan,

dated January 1991, 682502485–627, at 491 (listing as a financial performance objective to "[r]educe anticipatory buying of B & W products" in order to "minimize the practice of trade anticipatory buying to maintain shipment quantities and wholesale/retail inventories in line with consumer purchases"); B & W 1992–1196 Corporate Plan, dated January 1992, 682502375–483, at 382 (listing as a financial plan objective to "[c]ontinue to reduce the level of anticipatory buying of B & W products" and calling for "further reduction in anticipatory trade buying by one billion units in both 1992 and 1993"). Prior to the imposition of a permanent allocation system, B & W used a system that would "flag" wholesale purchases that exceeded normal amounts. *See* Baker Aff., ¶ 11. B & W testified that it recognized the "flagging" system was not doing enough to eliminate trade loading. *Id.* Because of the financial burdens already incurred due to Marlboro Friday, B & W was not going to meet its 1993 income projections and therefore determined also to incur the financial losses associated with terminating trade loading in 1993 as well. *See id.,* ¶ 12. As a result, B & W introduced its new allocation system in October 1993.[24]

In May 1993, B & W estimated that the costs of trade loading reached $32.9 million per year. *See* 670808014–17, at 015, Year–End Trade Loading History, dated May 26, 1993. In 1994, through its permanent allocation program, B & W reduced its product returns and the cost of those returns by $33.7 million between 1993 to 1994. *See* 483100328–370, at 340, 1995–1999 Company Plan, dated October 1994;

482320481–546, at 488, 1996 Financial Data Volume, dated August 29, 1996.

Plaintiffs describe B & W's allocation program as "when customers' orders ... exceed the 4–Week Limit for a brand style ... the order will be cut ...." B & W634260060–069, at 064. Plaintiffs, however, only selectively cite from documents in an attempt to support this contention. A full reading of the program shows otherwise. The same document cited by Plaintiff describes the Inventory Management Program as follows: "Maximum order quantities are designed to be liberal enough to permit full service levels for all customers. *If needed, they may be overridden or adjusted at your request to meet legitimate service needs."* B & W 634260063 (emphasis added).

Plaintiffs allege that the testimony of numerous witnesses supports their contention that the permanent allocation system restricted supply and that requests for exceptions to allocations were refused. Plaintiffs cite the deposition testimony of several wholesalers who testified they had to go through a chain of command to get additional product. *See* Wertheim Depo., at 34 ("[t]o get one case of cigarettes extra, I've got to go through a chain of command which is totally ridiculous."). The court notes, however, that upon further questioning, Mr. Wertheim admitted that on the three or four occasions that he had to call Richmond, Virginia to "beg" for cases of Marlboro, he did receive the requested amount of product. *See id.* at 37–38. Only one wholesaler testified that he was not able to get the product he was inter-

---

**24.** EOQ allows wholesalers to purchase between 110% and 130% of its previous four week order average. *See* Baker Aff., ¶ 14. Under EOQ, the field sales staff determined whether larger orders would be permitted. *See* Inventory Management Program, October 14, 1993, 6334260060 (instructing field representatives to call on account and do inventory check to see if account needs additional product or to determine if account has gained business or needs product due to special promotions); *id.* at 69 (during times of national promotion, quantities were automatically increased in the system).

ested in selling due to allocations. *See* G. Stevens Depo., at 104–13.

The deposition testimony of Anthony Karakas, also cited by Plaintiffs, is ambiguous on this point. Mr. Karakas testified that the allocation limits could change with "the amount of business that you were doing or you were going to do." Karakas Depo., at 79–80. Mr. Karakas then testified that on several occasions, he hit his allocation limit and he requested additional product from Philip Morris. He would make calls to try to get it increased and "sometimes they would modestly and sometimes they wouldn't." *Id.* at 80–81. He then stated:

Q: And what types of reasons would you give for needing an in—to go over your limit?

A: Extra business, getting a new account.

Q: Did you ever ask to actually change your allocation because you had a new account?

A: Yeah. Yes, we did.

Q: And were any of the manufacturers ever receptive to your changing the amount?

A: If they thought you had a bona fide reason, they would.

Q: But sometimes you would ask to change and they would simply permit you to buy over your allocation limit for that one time but keep your limit actually the same?

A: That's correct.

*Id.* at 81. It is unclear whether Mr. Karakas is testifying that he could get additional product on a one time basis but could not get his *allocation number permanently increased,* or whether he is testifying that he could not get additional product at all.

Plaintiffs also point to the testimony of Messrs. Whitehair, Polino and Gutlove to show the permanent allocation system restricted supply. *See* Facts, Resp., ¶ 56, at 26–27. The cited testimony, however, supports precisely the opposite conclusion. Mr. Whitehair, a former B & W senior vice president for sales and marketing, testified that if a wholesaler exceeded allocation, the request was flagged. Whitehair Depo., at 57. If the customer had acquired a "new chain of supermarkets" or "absorb[ed] a smaller customer," the manager had authority to approve the additional request. "If we thought they were trade loading, we would just cap his order." *Id.*

Mr. Polino, a wholesaler, testified that since 1993, he could only remember hitting the allocation limit perhaps five or six times. He recalled that his sales for Marlboro Light increased, and Philip Morris "did make an adjustment and increased our allocation for Marlboro Light box." Polino Depo., at 96. Mr. Polino also recalled that he hit allocation on Newports and called the Lorillard sales manager who increased the allocation with "no problem" at all. *Id.* at 98.

Mr. Gutlove, a wholesaler, testified that between 1993 and 1999, he "very seldom" went over allocation. Gutlove Depo., at 118. In fact, Mr. Gutlove only ran into problems with his allocation when he was trying to make additional purchases in anticipation of a price increase, the precise circumstance Defendants wanted to eliminate through their allocation program, and which Plaintiffs admit increased costs to Defendants. Facts, ¶¶ 52–53. Mr. Gutlove testified:

Q: So how many times over, say, the period from when you became president in 1993 until about two years ago [1999] did you get an allocation that prevented you from making an order?

A: Only when I expected a price increase towards the end of the year. . . . .

Q: Did some of those involve the fact that you had a new customer and expected -

A: No, no. Very seldom I took such a big customer that it would change my allocations.

. . . . .

Q: Had there been any occasions on which you asked for relief from an allocation for which the relief has been denied?

A: All the time.

Q: How many times has that happened?

A: Two or three times a year, whenever there was a price increase.

Q: When you say whenever there was a price increase, you mean when you anticipated that there would be a price increase?

A: Correct, when I anticipated, towards the end of—towards the end of December.

Q: So it was before there was a price increase and you were ordering more product than you normally did in that period?

A: Yes.

Q: What was the reason you were ordering more product than you normally did?

A: I believed that the manufacturers would raise their prices.

Q: And so if you ordered more product at the old prices, you would make a bigger profit; is that correct?

A: Correct.

Gutlove Depo., at 119–21. *See also id.* at 123 (describing not being able to "load" stock before a New York State tax increase). Thus, while it is clear the wholesalers did not like the allocation system, the testimony presented by Plaintiffs is either ambiguous or shows the opposite of what Plaintiffs contend. As such, no rea-sonable inference could be drawn from Plaintiffs' evidence that Defendants used the allocation system to restrict output.

Furthermore, the testimony of other wholesalers was that they never "bumped" up on the allocation limits. For example, Paul Nelson, President of Hartz Foods, testified that after discussion, he received permission from Philip Morris to lift the allocation limit. Nelson Depo., at 129–30. Mr. Nelson further testified:

Q: ... Do you recall any instances beyond that time when Walt Leach called Philip Morris to get an allocation limit raised that Hartz Foods ordered some cigarette product from a manufacturer and was told that it could not purchase it because its limits had been reached?

A: No, I don't know that we were ever told that our limit had been reached, but we were not allowed— we were not open to buy. So we couldn't just purchase whatever we wanted. We called when we needed to call however many instances that was.

Q: When you say we were not open to buy, what do you mean?

A: I mean, we were free to buy as many as we wanted. If I want to buy ten thousand cartons of Marlboro I could not do it.

Nelson Depo., at 130. Mr. Nelson testified that B & W, RJR, and Lorillard never told Hartz Foods that they could not buy cigarettes because they reached their allocation limit. *Id.* at 132. *See also* Goldschlack Depo., at 80–81 ("We were under allocation, but we never had a problem of needing more allocation. We were always able to get what we wanted if we needed it.... If I had hit the limit, depending on how severely I needed the product, I could have called the district manager, requested it and got it. I never ran into a problem.")

and *id.* at 81 (testifying that he always got the additional product he needed when he called the district manager).

Despite the import of this testimony, Plaintiffs also contended at oral argument that permanent allocation was an output restriction because it was a "zero sum gain." Oral Argument, at 75 ("if you went up 125%, somebody else had to go down that 25%"). There is no evidence in the record, however, to support this contention. In their Post–Hearing Submission in Opposition to Defendants' Motions for Summary Judgment, Plaintiffs point to Dr. Fisher's Report, ¶ 95, to support the contention that permanent allocation was a "zero sum" proposition. *See id.* at 7–8 citing PMAT000166499 ("[i]f one account allocation is increased, the other account should be decreased."). As the court described above, this provision is only relevant, however, when a retail account has moved from one wholesaler to another, not when a wholesaler acquired a completely new customer. As a result, no reasonable inference can be drawn that Defendants used permanent allocation programs as output restrictions.

Dr. Fisher, however, also contends that the permanent allocation system was used by Defendants to assure everyone involved in the conspiracy that there would not be "big share battles." Fisher Depo., at 142. *See also* Fisher Report, at ¶ 98 (using permanent allocation prevents a manufacturer "itself from rapidly increasing its market share, and thereby putting a system of coordinated pricing at risk. The system instead forces any manufacturer that wishes to grow to do so only slowly, giving other firms time to detect and respond to any overly ambitious strategy of increasing share beyond the limits that they find tolerable."). As the court notes below, however, there were significant share swings among Defendants after the initiation of the permanent allocation system.

It also appears that Dr. Fisher premised his opinions concerning permanent allocations on a belief that all of the Defendants initiated their permanent allocation programs at the inception of the conspiratorial agreement. But there is no dispute that Lorillard established its permanent allocation program in 1990. *See* Fisher Depo., at 461–64, 467–70 (testifying that he had been "mistaken" about Lorillard because he did not have a basis for stating that Lorillard put its distributors on permanent allocation in 1993). As Dr. Fisher's testimony is to a major degree premised on an erroneous understanding of the evidence, it is not and would not be admissible and may not be relied upon to defeat a summary judgment motion.

The parties dispute when RJR undertook its system of permanent allocation. It is clear, however, that RJR had some kind of allocation system in place in August 1992. *See* Memo to All Division Managers re: Direct Account Exception Order Guidelines, dated August 20, 1992, 519947427 (noting the manner in which customers can get either "one time" or "permanent" allocation adjustment). As discussed above, B & W began setting a permanent allocation program in motion as early as 1991. Thus, Plaintiffs are unable to support their contention that permanent allocation programs were implemented to facilitate a conspiracy initiated in November 1993.

Plaintiffs also contend that the permanent allocation programs facilitated the alleged conspiracy because Defendants "closely monitor each others' allocation programs." Pls.' Resp., at 53. Plaintiffs' documentary evidence, however, does not support such a contention. In one document cited by Plaintiffs, "Competitive Review—October 1993," Philip Morris employees engage in a ten-page detailed review of actions taken by each of its

competitors in the third quarter of 1993. In the section summarizing B & W's activities, the authors simply note that the company initiated an allocation program. *See* PMAT300005470. The other document cited by Plaintiffs is a summary prepared by Philip Morris of allocation systems in 1989 and 1990. Not only is this summary outside the alleged conspiracy period, it is also scarcely surprising that a company considering implementation of an allocation program would be interested in how its competitors handled the issues. *See* PM2048498527.[25]

In his rebuttal report, Dr. Fisher refers to a 1994 letter from McLane to Michael Szymanczyk at Philip Morris concerning McLane's LIFO transaction with RJR. *See* Fisher Rebuttal, ¶ 100–101 (citing PMAT000166524). The court was unable to locate the letter to which Dr. Fisher refers in the materials presented by Plaintiffs and, thus, is unable to construe the circumstances or context of the letter. In any event, the letter indicates only that McLane's end of the year LIFO purchase exceeded its weekly RJR usage. It does not support a claim that Defendants "closely monitored" each others' allocation program. This slim documentary trail hardly constitutes "close" monitoring of each others' allocation programs. Plaintiffs cannot string together three highly individualized documents and spin a conspiracy of "close monitoring" out of such a diaphanous web. No reasonable inference could be drawn from these documents that Defendants monitored each others' allocation programs.

■ As noted, Plaintiffs also contend that there was no economic reason for Defendants to have such programs. Although Plaintiffs characterize Defendants' justification for their permanent allocation programs as "false," Plaintiffs rely to a great degree on Dr. Fisher, who testified that he found "it hard to credit" Defendants' justifications for allocation for reasons relating to inventory control and freshness of product. Fisher Depo., at 144. The court has already found that an opinion by Dr. Fisher on the reason for the commencement of permanent allocation programs is inadmissible opinion evidence. Expert opinion evidence also would not be admissible on whether a statement is true or false. Making that determination is a question for the triers of fact done with the application of familiar principles, and the opinion of an expert would not help them in this task. (To be sure, an expert may be helpful in understanding the economic effect of a business decision.) Dr. Fisher's opinion that Defendants' justification is pretextual is the only basis Plaintiffs have for challenging Defendants' programs. As the court has found such an opinion inadmissible, Plaintiffs have not gone beyond the allegations in the Complaint and Defendants' explanation stands unchallenged. The court, therefore, finds that Defendants have established a bona fide reason for the allocation program. A different result is not obtained even with Dr. Fisher's testimony.

Although Dr. Fisher said wholesalers testified that freshness was not an issue with other products, such as candy, and the cigarette industry was the only industry that placed such emphasis on freshness, he did acknowledge that the cigarette industry did accept returns. Fisher Depo., at 145. Thus, Dr. Fisher agreed that "it would be the cigarette companies that were stuck with stale cigarettes, if that were to happen." *Id.* at 145–46. Furthermore, Dr. Fisher allowed for the

---

**25.** The court further notes that this document is labeled as "Exhibit A," but it stands alone in Plaintiffs' compilation of exhibits. Thus, Plaintiffs have provided no context or purpose for the generation of this document.

possibility that his skepticism of Defendants' rationale for permanent allocation would be diminished by the knowledge that Lorillard began its program in 1990. Dr. Fisher testified:

Q: ... Yesterday, in response to some questions of Mr. Boies, I think you indicated that you did not credit the suggestion ... that the system of permanent allocation related in part to reasons of inventory control and concerns over freshness.

Do you recall giving that testimony?

A: Yes.

Q: Does the fact that Lorillard began its permanent allocation program in a period of at least relative competitive conditions in the industry in any way cause you to reassess your rejection of the credence of that explanation?

MR. REINHARDT: Objection as to form.

MR. ISAKOFF: Let me rephrase the question.

Q: Lorillard—is it fair to say that Lorillard, by starting a permanent allocation program during a period in which competitive conditions were, I think, in your view, more unstable than they were after Marlboro Friday suggest to you that you should reconsider your rejection of the credence of the explanation that permanent allocation is related to inventory control and freshness?

A: You mean credibility, not credence?

Q: Credibility, fine.

A: Well, it's—I don't have a closed mind, so, yes, I am prepared to reconsider it, and this, it seems to me, is a reason to do that.

It doesn't seem, to me, to be totally compelling, no.

Fisher Depo., at 467–70.

■ Dr. Fisher then opined that "there are much simpler ways of dealing with that than permanent allocation, and indeed, if that were the principal reason, you would have thought the permanent allocation would have occurred many years before, since the freshness problem didn't suddenly arise after Marlboro Friday." *Id.* at 146. It is not the court's role, however, to second-guess the business judgment of the cigarette companies and find that Defendants "should have" instituted the programs earlier. *Todorov* instructs that where there is an independent business justification for defendant's behavior, an inference of conspiracy is not easily drawn. 921 F.2d at 1456 ("When the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative evidence that the law has been violated."). *See also In re Citric Acid,* 191 F.3d at 1101 ("Courts have recognized that firms must have broad discretion to make decisions based on their judgments of what is best for them and that business judgments should not be second-guessed even where the evidence concerning the rationality of the challenged activities might be subject to reasonable dispute."); *Reserve Supply,* 971 F.2d at 49–53 (same); Areeda, ¶ 1415d, at 90–91 ("The logic of any conspiracy argument here is that an apparently unprofitable act must reflect some additional cause, such as conspiracy. But the additional cause is needed to explain the challenged behavior *only if the defendant believes that his act would be unprofitable....* To satisfy this standard, the judge must conclude not only that the defendants were wrong but so

very wrong that their explanations should be disbelieved, or that it would be incredible that all the alleged conspirators could be similarly mistaken as to their true interests. The point is that the court's business judgment should not control.") (emphasis added). Plaintiffs have presented no evidence that Defendants themselves believed their economic justifications for permanent allocation were not true.

Furthermore, it is not altogether clear that Dr. Fisher disputes the economic justifications for permanent allocation programs. It appears that Dr. Fisher does not take issue with the use of the temporary allocation system used by cigarette companies prior to Marlboro Friday. Dr. Fisher recognizes that the temporary allocation systems were put into place prior to a price increase and prevented wholesalers from "trade loading" before such an increase. Fisher Report, at ¶¶ 87–89; Fisher Depo., at 141–43. Dr. Fisher contends, however, that the "permanent allocation system is not supported by any persuasive efficiency justification." Fisher Report, at ¶ 101. Dr. Fisher, however, does not explain the significance of a permanent, as opposed to temporary, allocation that would lead the permanent allocation system not to be "efficient." Dr. Fisher testified that "I don't know of any really good reason to put wholesalers on permanent allocations, as opposed to temporary allocations, except as a way of ensuring the other companies in the business that you are going to restrict the extent to which you can gain share." Fisher Depo., at 141–42. Defendants respond that they moved to permanent allocation because the temporary allocation system had alerted customers to potential increases in price, a fact the companies did not want to reveal until the actual price increase went into effect. Permanent allocations, thus, were a way to prevent public knowledge of price increases by a temporary allocation announcement. Dr. Fisher himself testified that he could "think of a reason why Philip Morris or any company might from time to time not want to let people know that the price increase was coming until they actually announced it." Fisher Depo., at 144. In sum, the evidence presented by Plaintiffs does not create a reasonable inference that permanent allocation programs increased the likelihood that there was a conspiracy. Given the clear evidence that the programs were perceived as being in the economic self-interests of Defendants and the fact that the system was in use by some before the alleged commencement of the conspiracy, a negative inference would be contrary to all reason.

### 4. Monitoring

■ Plaintiffs contend that Defendants "monitored" their conspiracy by sending detailed information, including pricing, to Management Sciences Associates, Inc. ("MSA/Pittsburgh"), regarding the volume of cigarettes sold by each manufacturer.[26] MSA/Pittsburgh is the self-proclaimed "world's largest processor of marketing, sales and financial data." See http://www.msa.com. In the consumer packaged goods category, MSA/Pittsburgh lists the following companies as clients: Adams Confections, Bongrain Cheese USA, Brown & Williamson Tobacco, Budweiser, Clairol, Coca–Cola, Fort James Corporation, Georgia–Pacific Corp., Heinz, USA, Kellogg Company, Kraft General Foods, Liggett Group Tobacco, Lorillard Tobacco Company, McLane Company Inc., Michelin Tires, Pepsi Cola Company, Philip Morris, Pinkerton Tobacco, Retail Services Inc., RJ Reynolds Tobacco, Scott Paper Company, SmithKline Beecham, Thomas J. Lipton, United States Tobacco Company, Warner Lambert, Welch Foods Inc.

**26.** As with several other contentions, this one is without appreciable evidentiary support.

Defendants began obtaining shipment-to-wholesale volume data from MSA/Pittsburgh beginning in the early 1970s. Facts, ¶ 47.

Philip Morris began its Wholesaler Masters Program in 1993. This program provided incentives to wholesalers to provide M.S.A./Pittsburgh with wholesaler-to-retailer data in addition to shipment-to-wholesale data. RJR began attempting to collect wholesaler-to-retailers shipment data in 1992, with its own pilot program beginning in July 1993. *See* Position Paper on Developing a Retail Information System, dated November 15, 1995, 51959 4305–4309. Lorillard also started receiving information on shipments of wholesalers to retailers in 1996. *See* Affidavit of Randy Spell, ¶ 8. B & W did not begin to receive wholesaler shipment to retailer data from M.S.A./Pittsburgh until November 1996. *See* Affidavit of Rick S. Baker, Division Vice President for the Trade Marketing Development, B & W, ¶ 26. As with the permanent allocation programs, the varied dates upon which Defendants started to gather wholesaler-to-retailer data belies Plaintiffs' notion of a conspiracy.

In their complaint, Plaintiffs allege that pricing information was sent to MSA/Pittsburgh in furtherance of the conspiracy. *See* Second Amended Complaint, ¶ 76. Discovery, however, revealed that no pricing information was collected and distributed. Despite the clear nature of this evidence, Plaintiffs resist Defendants' assertion that pricing information was not exchanged through the MSA/Pittsburgh arrangements. For example, in response to Defendants' Statement of Material Undisputed Fact ¶ 48, asserting that no data provided to MSA/Pittsburgh contained pricing information, Plaintiffs state: "MSA may or may not collect price data directly." The import of this statement is unclear. Plaintiffs plainly do not deny Defendants' asserted fact. In fact, it might be difficult to do so when Plaintiffs themselves in their discovery responses admit that no pricing information was sent to MSA/Pittsburgh. *See* Supplement No. 4 to Plaintiffs' Responses and Objections to Defendants' Interrogatories, Interrogatory No. 8, at 26–28 (in response to interrogatory requesting Plaintiffs to "[i]dentify each type, category or field of information that you provided to or received from any 'electronic database clearinghouse' including but not limited to MSA," no Plaintiff responded that pricing information was sent to MSA/Pittsburgh). *See, e.g.,* Gutlove Depo., at 89 (testifying he sends information on number of cartons sold by UPC code, retailer's name and address, including zip code and the date of purchase, but no pricing information); Polino Depo., at 47–48 (same); Wertheim Depo., at 177–79 (same). Thus, Plaintiffs' own testimony establishes that no pricing information was directly sent to MSA/Pittsburgh by the wholesalers.[27]

Even if pricing data were not directly submitted to MSA/Pittsburgh, Plaintiffs contend that it could be derived from the detailed volume data reported. *See* Pls.' Resp., at 53–54 n. 26 (citing Fisher Report, ¶ 110). A review of that paragraph of Dr. Fisher's report does not reveal any opinion

---

**27.** Plaintiffs' citation to Liggett's description of Philip Morris' Wholesale Master's Program is not contradictory. Liggett indicates that the electronic reports include "detailed retail store information for all manufacturers' products including SKU level detail, on-hand warehouse inventories and all promotional deals." LIGG009154. It says nothing about price. Furthermore, this document, far from showing a conspiratorial purpose behind the reporting requirements, indicates Liggett's belief that Philip Morris was using its market share and the incentives provided to participants in the Wholesale Master's Program to force wholesalers to stock more Philip Morris inventory than that of competitors. *See id.*

by Dr. Fisher that pricing information could be gleaned from the supply data sent to MSA/Pittsburgh. In fact, Dr. Fisher's testimony seems to contradict Plaintiffs' point:

Q: For example, as you understand it, Philip Morris would know how much each individual wholesaler sold of RJR cigarettes to each individual retailer?

A: I believe they would know it in finer detail than that. They would know it by brand.

Q: Do you believe they also know the prices at which their cigarettes were sold?

A: Not from that.

Q: From what do they know the prices, if anything?

A: I don't know that they do know the prices.

. . . . .

Q: The M.S.A./Pittsburgh data does not include data with respect to prices; is that right?

A: That's right.

Q: So that the only way that you could infer that there is a price cut is if you saw a volume increase; is that correct?

A: That's right.

Fisher Depo., at 157, 162.[28]

Defendants argue that this type of "facilitating practice" is not sufficient to constitute a "plus factor" because collection of information about volume distributed by each Defendant does not exclude the possibility that Defendants were acting lawfully. Defendants' expert contends that there are legitimate usages for the sales volume data that MSA/Pittsburgh collects. "Just as in many other markets, cigarette manufacturers use sales volume data to learn how their brands are selling relative to rivals' brands. Information like this can foster competition because it enables firms like Philip Morris to target its potential customers, adjust its prices by brand and tier to reflect changing market conditions, and evaluate the impact of retail promotions." Elzinga Report, at 17.

Dr. Elzinga concedes that a "cartel seeking to allocate and stabilize market shares might utilize share-of-market and volume information to monitor cartel compliance," but he also notes that "firms *competing* against one another also gather and analyze market share and volume information" to determine where promotions are needed. *Id.* at 17 (emphasis in original). Dr. Elzinga contends that Defendants could not monitor competitors' prices at retail from the data provided by MSA/Pittsburgh. To get this information, companies pay for research data from A.C. Nielson or IRI/Capstone. *Id.* at 18.

The court notes that Plaintiffs' expert seems as ambivalent about this information as Defendants'. Dr. Fisher opines that a

cigarette company may need to know the sales of its own brands (perhaps as a share of total industry sales) to determine whether wholesalers and retailers have met its incentive program targets. A company may also find it useful to collect information about its competitors' shipments for reasons other than facilitating coordination. For example, if the data reveal that a competitor's 100 millimeter menthol lights have suddenly become extraordinarily popular in rural

---

28. Moreover, pricing information seems irrelevant to Plaintiffs' more fully articulated theory that Defendants did not use MSA/Pittsburgh to obtain pricing, but rather to monitor the conspiracy and to detect "cheaters." *See*

Fisher Report, ¶ 110; Fisher Depo., at 160 ("continual monitoring of market share data is one way to ensure that cheaters will be detected").

Kentucky, a firm may wish to make sure that its own brand of this style of cigarette is readily available and even promoted in those areas. However, while there may be legitimate competitive reasons to want to know how other firms' products are selling, it is often the case that a company is much less willing to allow its own data to be provided to its rivals.

Fisher Report, ¶ 109. *See also* Fisher Depo., at 459 (testifying that he understood that such data could be useful to Lorillard "in competing and brand building at retail"). This assessment does not preclude the possibility of competitive conduct. Dr. Fisher, himself, seems to recognize that such information could be used competitively by beginning the next paragraph in his report with the phrase "[w]hatever other role it might play, ..." such monitoring is a useful facilitating device. Fisher Report, ¶ 110. Dr. Fisher testified:

Q: As you understand it, are there legitimate business reasons for the companies to exchange volume data?

A: There are legitimate reasons why each company would like to know the other's volume.

Q: Why is that?

A: That depends on how detailed one gets that. The example that is used in the report is, gee, if somebody is having a surge in a particular kind of cigarettes in a particular part of the country and we want to get ahead of this, because there is a change in demand, we would like to know if that's happening.

Q: Would knowing that that is happening improve the level of competition?

A: Yes.

Fisher Depo., at 159–60.

In addition to being ambivalent, Dr. Fisher's discussion of the MSA/Pittsburgh data consistently focuses primarily on its use as a "facilitating device."

Q: With respect to the exchange of market share data, in your view, can that exchange of data facilitate price coordination?

A: Yes.

Q: How?

A: One of the things ... that's required or that helps price coordination is the assurance that others are not cheating, that they are not offering secret price cuts and trying to gain share by cheating on the arrangement. A continual monitoring of market share data is one way to ensure that cheaters will be detected.

*Id.* at 160. Even Dr. Fisher's testimony, however, shows that volume monitoring is not a very efficient method of detecting cheaters:

Q: Would you agree that if there are significant increases in volume that [they] are not related to price cuts because it is your testimony that there have not been price cuts, correct?

A: Yes.

Q: Would you agree that if there were then significant increases in volume, this would not be a good way of monitoring whether or not there were price cuts?

A: No I wouldn't.

Hold on. In the first place, there are price promotions at retail, and some increases in volume occur for that reason. Secondly, monitoring volume, even if there are fluctuations in volume, is a way of being sure that there isn't a—or that people can't get

away with systemic large scale cheating on the agreement.

Q: How does somebody determine whether somebody is gaining or losing market share because of systematic cheating or simply because they are doing better?

A: Well, A, it's a lot easier to do that if you have the data than if you don't. B, you can ask the question, okay, somebody is gaining at certain wholesalers. Is there something going on that explains it? Is there a couponing promotion in place, is there a buy-some-get-some-free in place, you know, do we know what's going on here. If not, is there something we need to explain. If the thing we need to explain is large, and then the question becomes why, and as I say, it is a lot simpler—it may not be perfect, but it is a lot simpler to sort out cheating from sort of natural fluctuations and natural from somebody just doing better if you have the data than if you don't.

*Id.* at 163–64. Moreover, the fact that a "facilitating device" *could* be used in furtherance of a conspiracy is not sufficient to constitute such a practice a "plus factor." To be a "plus factor," a practice must tend to exclude the possibility that Defendants are engaged in lawful conduct.

The documents cited by Plaintiffs also are equally subject to multiple interpretations. A PM–USA Five Year Plan Summary document illustrates that Philip Morris wanted to continue to improve its ability to monitor consumer and market trends to "flag shifts in market trends and provide information on possible causal factors. These reports will provide significant insights into competitive strategy and provide PM–USA the ability to recognize and respond to shifts in the market before they become widespread." PMAT 500103299–3300. An untitled Philip Morris document states:

> In 1993, we launched a new Wholesale Masters Program which linked trade payments to wholesaler performance against specific PM share targets and business objectives. In March 1994, we expanded the program to require that distributors require weekly shipment data by retailer and sku. We now receive weekly cigarette shipments from our wholesalers to over 300,000 retail outlets. *This information gives us competitive advantage over all manufacturers in planning our marketing expenditures.* At present, accounts representing 78% of our volume have signed up and accounts representing 71.7% of our volume are submitting data. The database gives us better inventory control and an early warning system for competitive initiatives.

PMAT000026525 (emphasis added). In their response to Defendants' Statement of Material Undisputed Facts, at 23, Plaintiffs interestingly omit the portion of this document highlighted by the court and focus rather on the last sentence only. Seen in context with the entire discussion, however, is at least equally, and most likely more, susceptible to interpretation as a competitive, rather than collusive discussion. It is a significant element of competition to try to prevent your competitors from gaining share inroads into your product sales.[29] Accordingly, the court finds

---

29. The court also notes that Plaintiffs offer no support for their contention that each modification to the service provided by MSA/Pittsburgh was made with the "joint agreement of all Defendants." Pls.' Resp., at 54. Rather, the documents cited by Plaintiffs show that MSA/Pittsburgh discussed various proposals with each company individually and made modifications to their services based on their, MSA/Pittsburgh's, views about what would be the most acceptable to their customers.

that the testimony of Plaintiffs' expert is ambiguous as to whether the information sent to MSA/Pittsburgh was used to monitor the conspiracy. As the court described above, because Dr. Fisher's testimony does not make it more likely that Defendants had an agreement to fix prices, it is of no relevance. *See* Fed.R.Evid. 401. As Plaintiffs' contentions about Defendants' monitoring of the conspiracy do not tend to exclude the possibility of competitive conduct, the sending of information to MSA/Pittsburgh cannot be a "plus factor."

### 5. Actions Contrary To Economic Interests

Plaintiffs contend that on numerous occasions, Defendants took the following actions against their economic interests: (1) non-initiating Defendants always followed price increases; (2) after Marlboro Friday, B & W and RJR turned away from discount cigarettes; (3) RJR led, and Philip Morris followed, a price increase despite planning documents which reflected they would not take increases; (4) each Defendant exchanged information through MSA/Pittsburgh; (5) each Defendant had permanent allocation programs; (6) Philip Morris based settlement payments on market capitalization and not market share; and (7) Defendants agreed to pay "excessive" settlement price increases.[30]

■ It is clearly established that actions taken against economic interest may be a "plus factor." *See Harcros,* 158 F.3d at 572. However, as described above, in analyzing such allegations, the court must be mindful not to engage in second-guessing of companies' business decisions. *See Todorov,* 921 F.2d at 1456–57; *In re Citric Acid,* 191 F.3d at 1101;

*Reserve Supply,* 971 F.2d at 49–53; Areeda, ¶ 1415d, at 90–91. Similarly, the court in *In re Baby Food* cautioned that "actions against economic interest" was an "ambiguous" term that simply could be interpreted as a restatement of the definition of "interdependence." *See* 166 F.3d at 122 (stating, for example, that "refusing to raise or lower prices unless rivals do the same could be against a firm's self-interest but nevertheless could spring from independent behavior"). In the Eleventh Circuit, to show that an act is against "economic self-interest" the "plaintiff must establish that each defendant would have acted unreasonably in a business sense if it had engaged in the challenged conduct unless that defendant had received assurances from the other defendants that they would take the same action." *Harcros,* 158 F.3d at 570 n. 33 (quoting *Bolt v. Halifax Hosp. Med. Ctr.,* 891 F.2d 810, 826–27 (11th Cir.1990)).

### a. Little Analysis of Whether to Follow Price Increases

■ Plaintiffs contend that either Philip Morris or RJR initiated every price increase from November 1993 through February 2000. It is contended the price increases could have an effect on a follower's financial situation and place in the market, and yet Defendants followed price increases with little or no analysis. It is true that while little appears to have been done to evaluate alternatives, Plaintiffs point to no evidence to support the contention that following the price increase was against Defendants' economic interests. *See* Pls.' Resp., at 59–60. It is important to note that Plaintiffs do not argue that the quick decisions support the notion that

---

There is no evidence in the documents cited by Plaintiffs that any of the Defendants negotiated together or reached any agreement together about what services they would request from MSA/Pittsburgh.

**30.** The court has addressed above Plaintiffs' arguments concerning the permanent allocation program and the sending of data to MSA/Pittsburgh.

there was an agreement to do so. Further, such an argument would not be helpful. *See Blomkest,* 203 F.3d at 1032–33 (fact that "price changes by one producer were quickly met by others ... establishes only that the producers consciously paralleled each other's prices"). This court finds that no inference here may be drawn from the speed with which competitors followed price increases. Conscious parallelism is not unlawful, and, as said, there is no evidence that the followers had more favorable alternatives.

Testimony and contemporaneous documents show that RJR, B & W, and Lorillard found their options extremely limited after Philip Morris' Marlboro Friday announcement. Under those circumstances, Defendants contend, it did not take much analysis to decide whether to follow the price increases of RJR and Philip Morris. As Plaintiffs' expert testified, Marlboro Friday "made it clear to the other companies that Philip Morris was prepared to take quite drastic action to get what it wanted in the way of pricing." Fisher Depo., at 32–33. RJR also recognized that with Marlboro Friday, Philip Morris was announcing that it would maintain Marlboro's market share growth at the "expense of profits." *See* Perspective on Marlboro Friday, dated April 26, 1994, 51696 9589. *See also* Keith Depo., at 87 (testifying that trying to gain a "competitive advantage via pricing actions" would not be successful against Philip Morris because RJR is not "as strong a financial company"); Beasley Depo., at 131 ("They [Philip Morris] have a lot more money than we do, and they're not going to let us take share from them because we're at a lower price. It's just not going to happen over a sustained period of time."); Johnston Aff., ¶ 13 (the drop in earnings experi-

enced by RJR after Marlboro Friday was serious problem for the company because RJR/Nabisco, RJR's parent company, carried a great deal of debt following a leveraged buy-out by Kohlberg Kravis Roberts in 1988). In considering its responses to Marlboro Friday, RJR rejected maintaining higher prices. *See* RJRT Update, April 28, 1993, at 51649 0214 ("Past lessons learned in Savings show that if we don't respond, we are badly and quickly hurt ... RJRT share would decline substantially."). RJR could not afford to lower its prices further than Philip Morris did. *See* Responding to PM's Share Initiative, April 7, 1993, at 51643 6584 ("An across-the-board price war would be worse than the scenarios outlined."). Thus, RJR decided to match Philip Morris' price reductions.[31]

RJR then undertook a series of "war games" to determine its strategy in response to Marlboro Friday. RJR reviewed the results of the "war games" and determined that "[p]ricing is too easily matched, and therefore an ineffective way for gaining advantage." Strategies, 51602 8811. *See also* RJR 1994–1998 Strategic Plan, June 1993, at 51953 4165 ("our objectives address how to compete in an evolving price war environment, while reducing its erosion of margins and earnings ... price is not a competitive advantage—escalating discounts does not pay"); Memo of James Schroer, Vice President of Sales & Marketing, November 4, 1993, at 51961 6249 ("I learned in 1993 that Nuclear War over market share between RJR and PM is a disaster we cannot afford, and we are all better off engaging in a 'Cold War.' "). Considering all of this information, RJR developed a "defensive price strategy." *See* 1994–1998 Strategic Plan, June 1993, at 51953 4166 ("Avoid escalating the price

---

**31.** Dr. Fisher did not disagree with this strategic decision. *See* Fisher Depo., at 68 (testifying that he thought there were "legitimate business reasons" for matching price decreases immediately following Marlboro Friday).

war: match competitive discounting, but do *not* use price to grow share.") (emphasis in original). Once RJR determined what its strategic response would be to Marlboro Friday, there was no need to re-complete that evaluation each time RJR needed to decide whether to respond to a price increase. Plaintiffs presented no evidence to challenge RJR's conclusion that it was in its economic interest to follow price increases.

Furthermore, these and other contemporaneous documents reflect RJR's uncertainty about what trends would occur in pricing—an uncertainty that belies Plaintiffs' allegations of conspiracy. *See* Agenda 1995 Outlook, dated September 12, 1994, 51961 1618–1626, at 1620 (predicting, incorrectly, that Philip Morris would lower premium prices in November 1994); Price Rollback Contingency Plan, dated September 16, 1994, 51694 6787–6822, at 6788–89 (assuming Philip Morris would lower prices by $1.50 /carton, but recommending that RJR only drop $1.25/carton); Intercompany Memorandum, May 25, 1995, 51393 1583 (noting possibility of another Philip Morris rollback); 1996–1998 Strategic Assessment, dated June 1995, 51952 6068–6085, at 6077 ("market disruption due to pricing actions remains huge concern") at 6080 ("'Price Wars' continue to be a looming threat as players guard and/or develop market positions").

Similarly, B & W contends that as a small player in the cigarette industry, it really had no choice but to follow the price leadership of Philip Morris and RJR, who made up nearly 75% of the cigarette industry. Facts, ¶¶ 58–59. Mr. Carpenter, brand manager for B & W's GPC brand, testified that it did not take much analysis for B & W to follow RJR's November 1993 price increase.

> There is such a thing within the company as institutional knowledge. I mean, we have had price increases over the years, so it is not like each individual price increase requires a huge amount of analysis to determine whether it is a good thing or not. In the case of the Reynolds price increase in November, as I recall it, given the financial pain that we had suffered as a result of Marlboro's actions, it probably took us less than a second to make that decision that of course we wanted more money, and more profitability, so that analysis would have been quite simple.

Carpenter Depo., at 69. *See also* Brookes Depo., at 102–03 (B & W followed RJR's price increase in May 1995 because there had not been a price increase for some time and volumes were declining, so a price increase gave an opportunity to reverse profits that had been "flat to declining"). Lorillard had similar concerns. Because of its market size, Lorillard viewed itself as a "price taker" rather than a "price leader." *See* Spell Depo., at 43 (Lorillard could not lead price increase because volume and share would suffer). *See id.* at 44–45 (Lorillard could not lead price decrease because they could not get separate price points from various points in the distribution chain). Again, Plaintiffs offered no evidence to challenge the economic decisions of B & W and Lorillard.

Plaintiffs contend in this connection that there was little analysis of whether to follow price increases because Defendants had advance notice of competitors' price announcements, *see* Pls.' Resp., at 24–25, and they paint these as evidence of an agreement. Plaintiffs argue that this "advance notice" was given through Gary Black's reports in 1995 through 1997. As the court has explained above, however, Mr. Black received his information from "the trade," most often wholesalers, and not from the cigarette manufacturers. Thus, his reports provided nothing more than his own personal analysis of publicly available information. Moreover, as De-

fendants have demonstrated, Mr. Black was far more often inaccurate in his pricing predictions, than accurate. No reasonable inference could be drawn, therefore, that his reports constituted some kind of "advance announcement" of a pricing decision.

Plaintiffs also assert that RJR and B & W had Philip Morris' Labor Day 1997 price increase announcement before Philip Morris released it to the trade and that Lorillard had advance notice of price increases on November 23, 1998; August 24, 1999; and a federal government price increase announcement of August 12, 1998. Philip Morris announced on August 29, 1997, that it would increase its prices effective September 2, 1997. *See* RJR 58003 9738. The documents cited by Plaintiffs give no indication that RJR had prior knowledge of that announcement. In fact, they indicate the precise opposite. RJR distributed through its organizations copies of competitors' price increase announcements *after* they had been made. *See* RJR 58003 9743 (announcement of August 30, 1997 B & W price increase faxed on September 2, 1997); RJR 58002 9472–73 (copy of August 29 memo distributed through RJR attaching August 29 price increase announcement by Philip Morris); RJR 53002 7868–69 (copy of September 2 memo distributed through RJR attaching August 30 price increase announcement by B & W); WU001273–75 (August 29 instructions from RJR to Western Union for price increase announcement). *See also* Supplemental Affidavit of Clay Lentz, ¶¶ 3–6.

Plaintiffs contend that B & W had advance notice of the Labor Day 1997 price increase and the January 23, 1998 increase. Again, Plaintiffs' citations to the record fail to support this contention. Plaintiffs cite a document entitled "Market Information TMB Report, August 1997." Although Plaintiffs give no indication who

produced this report, it is clear from the document itself that it contains only public speculation about price announcements. *See* 462116427 ("Effective October 1st, cigarette prices in the U.S. will increase $3.50 per thousand, or $.70 per carton. *Press reports suggest* this increase will be put into place to cover settlement costs resulting from the Mississippi and Florida class action lawsuits.") (emphasis added). The other document cited by Plaintiffs, "Industry Assumptions," is clearly a document speculating on the effects of the costs of settlement of suits in the tobacco industry. *See* 544109245–46 ("Our *assumption* is that [settlement costs and elasticity] will force Philip Morris to redeploy funds into discounting .... It is *assumed* that other major trademarks, Camel, Newport, Basic and Doral, maintain their current relative pricing strategies .... The industry will take a price increase of $2.50/M in 1/1/98.") (emphasis added). The "Industry Assumptions" document reflects a competitive environment where each company tried to plan its responses to guessed plans of fellow competitors rather than a cartel. In fact, both of the predictions made in these documents did not prove out.

Although Plaintiffs contend that "Lorillard had advance notice of imminent price increase announcements taken on November 23, 1998, and August 24, 1999," Pls.' Resp., at 25, Plaintiffs' citations again fail to support this allegation. Plaintiffs cite two "Contact Report" records kept by the company hired by Lorillard to send out price announcements. One report stated: "Sam [Zolot, Lorillard, General Manager of Sales Planning and Operations] called to give heads up that a price increase might be going out within the next two weeks." The other noted: "Called Kathy [Sparrow, Lorillard Vice President of Sales] to see if she was going to send out price increase tonight. She was in a meeting and will call back." *See* Lorillard Reply Brief, Ex.

2. Neither of these statements reflects the import ascribed to them by Plaintiffs that Lorillard had advance notice of price increases.

Plaintiffs contend that Lorillard received a Philip Morris Federal Government price change announcement on July 25, 1998, before its issue date of August 12, 1998. Lorillard demonstrated conclusively that it did not receive the announcement on July 25, 1998, but rather received it on *August* 25, 1998. *See* Lorillard Reply Brief, Ex. 1 (comparing Lorillard 90260724 with Lorillard 05005150, and August 25, 1998, time stamp); Oral Argument, at 31–32. Thus, the evidence pointed to by Plaintiffs would require a jury to engage in speculation and conjecture to such a degree as to render its finding a "guess or mere possibility" that Defendants received advance price announcements from competitors.[32]

### b. B & W/RJR Going Away from Discount Cigarettes

 Plaintiffs argue that it was against the economic self-interest of B & W and RJR to turn away from the discount cigarette market. Plaintiffs note that in 1992 and 1993, RJR and B & W were "making significant inroads" into Philip Morris' market share by emphasizing non-premium categories. Plaintiffs further state that "analysts expected" that B & W and RJR would continue to pursue the discount market even after Philip Morris' Marlboro Friday announcement. Finally, Plaintiffs contend that it "was well recognized that it was not in either B & W's or RJR's economic interest to cease the discounting and promotions that had garnered them increased profits and market share at PM's expense." Pls.' Resp., at 60–61.

Significantly, the court notes that the *only* support Plaintiffs offer for their contention that "analysts expected" and it was "well recognized" that RJR and B & W should continue to pursue the discount market is the testimony of Gary Black. Plaintiffs point to the "estimation" of Mr. Black that had RJR "continued its market share drive in the discount segment, it could have been the new overall market leader by 1997." Pls.' Resp., at 36. Plaintiffs' gloss on Mr. Black's statement is misleading in several ways. Mr. Black's statement is taken from a document entitled "Cigarette Price Wars: Philip Morris' Strategy and Likely Outcomes," dated May 10, 1993. In that document, Mr. Black reviews the "origins" of the "price wars" and presumably, Marlboro Friday. He states as one of the origins that "RJR Was Winning Too Much Share: New Market Leader by 1997?" LOR05013199–217, at 200. Thus, Mr. Black's statement was not a prediction of what he would have expected RJR to accomplish *after* Marlboro Friday, but rather was an explanation for why Philip Morris felt it needed to take action in the form of the Marlboro Friday

---

**32.** The parties also dispute the manner in which wholesalers price cigarettes. Defendants contend that wholesalers raise prices on all manufacturers' brands as soon as one manufacturer raises its prices. As such, Defendants argue, they must follow price increases because to do otherwise would "leave money on the table" for wholesalers. Plaintiffs contend that wholesalers are able to price separately all brands of cigarettes, so Defendants would be able to distinguish their prices from competitors.

The court need not decide this issue because Plaintiffs have presented no evidence from which a jury could reasonably infer that "follow the leader" pricing was against the economic interest of Defendants or reflective of an agreement to fix prices. The court notes, however, that while there is some limited evidence to the contrary, it appears the vast majority of wholesalers act as Defendants contend. *See. e.g.,* Supplement No. 4 to Plaintiffs' Response and Objections to Defendants' Interrogatories; Gutlove Depo., at 224–25; Nelson Depo., at 79–80; and Wertheim Depo., at 93, 152.

pricing changes. Furthermore, Mr. Black's statement is far from definitive; he himself uses a "question mark" when considering whether RJR would have been the new market leader by 1997. In fact, Mr. Black himself indicated in October 1993 that he expected the cigarette manufacturers to focus on profits rather than market share. *See* RJR Reply Brief, Ex. 35, October 29, 1993 Analyst Report, at 10 ("Our view is that Philip Morris' competitors will realize that the optimal solution is to focus on profits—even though on its own, a market share strategy seems to make more sense if Philip Morris continues to do so."); Black Depo., at 163 ("It could have [been the 'perfect opportunity' for B & W to expand market share by discounting], except that Brown & Williamson was hurt by the price war as well. Their profits had gotten pummeled, their stock price was down sharply, and our thought was why would you want your stock price to remain low as an investor."). Thus, Mr. Black's testimony does not show that "analysts expected" RJR and B & W to continue discount marketing after Marlboro Friday.

Similarly, Plaintiffs offer no support for their contention that after Marlboro Friday it was "directly contrary to the self-interests of B & W and RJR" to raise the prices of discounted cigarettes. *See* Pls.' Resp., at 61. The document cited by Plaintiffs is an analysis of competitors conducted by Philip Morris in November 1993. It does not indicate at all that it was contrary to the interests of B & W or RJR to raise the price of discounted cigarettes. *See* PMAT000216641–653. In fact, the document reports that RJR's price increase was met with great favor by investors and stock analysts. *See id.* at 646.

Plaintiffs also contend that it was against the economic self-interest of RJR and B & W to "maintain a price gap" between premium and discount brands because those two companies were more heavily invested in discount brands. *See* Pls.' Resp., at 61–62. RJR, however, contends that it was in its economic self-interest to protect its premium brands, Camel and Winston, because those brands generated higher margins than its discount brands. RJR, then, also wanted to maintain an "appropriate gap" between the two tiers so that sales of its premium brands would not decline too much. *See* RJR Reply, at 15. RJR has proffered contemporaneous documents that support its strategic decisions to maintain a price gap. *See* RJR Confidential 1996 Pricing Strategy Overall Guidelines, 51693 6267 ("The importance of managing the price relationship (gap) between RJR Full Price Non Menthol (Camel, Winston, Vantage) and competitive brands at retail cannot be underestimated. These relationships are based on sophisticated statistical models, and when executed properly, have proven to hold our business."); Strategies, 51602 8811 ("profitability in Full–Price is still several times that of Savings"). RJR also responds that it could not have continued to pursue the same discount strategy that it used prior to Marlboro Friday because of the significance of Marlboro Friday. RJR learned that if it continued to pursue discount prices downward, Philip Morris could respond in the same manner it did on Marlboro Friday.[33] B & W apparently reached the same conclusion. *See* BAT000001172 (Marlboro Friday "forced all companies in the industry to reevaluate their brands since they can no longer

---

**33.** Plaintiffs have provided no expert testimony, for example, showing that increased discount sales would have offset the lower profit margins, to support their contention that RJR would have been economically better off after Marlboro Friday by pursuing the discount market.

count on increase volumes in the VFM sector").

B & W contends that it did not move away from the discount market, but that it moved its spending to the retail level where the company believed its spending would be more effective. *See* Schoenbachler Aff., ¶ 26 ("[W]e believed that we could use the increased revenue from higher list prices strategically to discount GPC's retail prices ... and thereby increase the retail price gap where we could gain the greatest advantage."). Documents cited by Plaintiffs also confirm this strategy. *See* BAT0000011168 (B & W has been "implementing sales incentive programs that further emphasize a partnering between B & W and retailers and wholesalers"); BAT0000011649 ("PM has already demonstrated its willingness to invest in achieving a FR/VFM price differential that is beneficial to its portfolio mix.... Their strategy is detrimental to B & W, as our portfolio mix is 60% VFM products. *B & W's philosophy is to provide competitive discounting support which ensures that the consumer experiences, at retail, at least the current price advantage in VFM products from FR.*") (emphasis added).

Defendants offered additional contemporaneous documents reflecting the same. *See* B & W Analysis of Industry Pricing Dynamics and Recommended Strategies, Oct. 29, 1992, 690802309–331, at 316 ("To execute its pricing strategy, B & W recommends that the company generally follow the industry's pricing actions given the difficulty of operating outside established industry boundaries.... Some portion of the [list] price increases will be discounted back to consumers to maintain the targeted [retail price] spreads."); B & W 1993–1997 Corporate Plan, Jan. 1993, 526030282–392, at 303 ("GPC has proven that an aggressively-supported program, with promotion spend directed at the consumer, remains the most effective and efficient method of competing."); B & W 1994–1998 Five Year Plan, Dec. 1993, 526300784–864, at 802 ("Given GPC's objective of growing share, volume and brand contribution throughout the Plan period, the key brand strategy is to maintain the brand's price competitiveness by providing sufficient discounting support to compete at/near the market bottom."). Thus, B & W chose to battle not on the wholesale list prices, but rather on providing discounting at retail. Plaintiffs have proffered no evidence that this strategic decision was against the economic interests of B & W.[34]

Plaintiffs offer nothing more than the musings of Mr. Black to support their contention that RJR and B & W "should have" maintained emphasis on the discount market. Plaintiffs have not disputed the contemporaneous documentation provided by Defendants to support their strategic decisions. Further, there is no evidence that B & W de-emphasized discount brands. As such, Plaintiffs have presented no evidence from which an inference could be drawn that RJR's and B & W's actions were against their economic self-interest.

---

**34.** The court understands that where price fixing is alleged, an injury to competition is presumed. It would seem, however, that the presumption is somewhat suspect in this case. The demand for cigarettes is fairly inelastic. Further, there is sufficient product differentiation so that wholesalers do not have an opportunity to substitute Winstons for Marlboro if Winstons are cheaper than Marlboro, so it is difficult to see what the injury to competition is at the wholesale level. There is cross-elasticity of demand between brands at the retail level. As such, B & W's decision to discount its VFM brands at the retail level is pro-competitive and it evidences an intent to maintain its commitment to discount brands. It is by no means an "unreasonable" business decision, and it is inconsistent with an agreement to fix prices to please Philip Morris.

#### c. The May 1995 Price Increase

█ Plaintiffs contend that it was against the economic interest of RJR and Philip Morris to increase prices by $1.50 per pack in May 1995 because the companies had previously stated they would not take a price increase in 1995. Plaintiffs cite a January 18, 1995 speech made by Philip Morris' CEO to the Board of Directors which indicated that Philip Morris planned no price increase in 1995. *See* PMAT100009165. Plaintiffs also point to an internal RJR recommendation against raising prices in 1995.[35]

RJR responds that while it is true that internal RJR staff recommended against raising prices, that recommendation was made because it was "doubtful" whether the other companies would follow RJR's price increase, a concern that belies Plaintiffs' allegation of price fixing. Nonetheless, RJR's CEO Jim Johnston decided in the spring of 1995 to increase prices in order to determine whether its competitors would do the same. *See* 51694 6707 ("Push price until see a problem created, then bring price back down."). Mr. Johnston testified that RJR "continued to face earnings pressure and to look for ways to improve its performance." Johnston Aff., ¶ 17. Thus, RJR decided to take the risk of increasing prices. Plaintiffs' expert also agreed that "RJR was under considerable pressure in 1995 to improve its profits." Fisher Depo., at 122. Furthermore, Plaintiffs' expert testified that it would not have been "irrational" for Mr. Johnston to de-cide the risks mentioned in the recommendation were worth taking. *Id.* at 482.

Philip Morris followed RJR's price increase. While it is true that Philip Morris' CEO told the Board of Directors in January 1995 that the company planned no price increases in 1995, Plaintiffs, again, did not cite fully the CEO's comments.

> We also plan NO PRICE INCREASE in 1995. The benefit of this strategy will be higher Premium volume and a strong competitive advantage. PM USA has not raised prices since November 1993, and we firmly believe that we can significantly increase our IFO without resorting to either a price hike or a decrease in marketing/sales impact. *If the competitive environment changes significantly, however, we will respond immediately and appropriately.*

PMAT100009165 (italic emphasis added). Thus, Philip Morris did not say under any circumstances would it not raise prices in 1995; it left open the need to respond to competitors' actions.

Plaintiffs contend that Philip Morris had some remorse about its decision to follow RJR's price increase. *See* Pls.' Resp., at 63 (Philip Morris "subsequently conceded this was not in its self-interest"). The document cited for this proposition, however, provides no such support. *See* PMAT000003105–115, at 106, September 25, 1995 Memo from Jim Morgan to Geoff Bible ("However, our year was not without challenges and one major setback—the product recall which slowed our momentum and gave our competitors an opportu-

---

**35.** Plaintiffs' expert contends that the "pricing event is difficult to understand outside the context of explicit coordination through direct communications between companies." Fisher Report, at ¶ 78. *See also id.*, at ¶ 82 ("it is difficult to understand R.J. Reynolds' decision to lead a price increase unless some explicit communication took place, giving R.J. Reynolds the assurance that Philip Morris would follow its price increase."). As demonstrated below, a full reading of the contemporaneous documents shows that, indeed, RJR was concerned about whether other companies would follow its increase, thus, contradicting Dr. Fisher's theory. These statements, furthermore, offer no support for a contention that the May 1995 price increases were against the economic self-interest of Philip Morris or RJR.

nity to attack our premium brand strength. Their increased spending behind premium brands, fueled by the May price increase, has expanded the premium segment and lowered our share of this category."). This statement does not indicate that Philip Morris believed following RJR's May 1995 price increase was against the company's economic interest. Accordingly, Plaintiffs have proffered no evidence from which a reasonable inference could be drawn that the May 1995 price increase was against the economic self-interest of RJR or Philip Morris.

### d. PM's Market Capitalization Agreement

 Major tort cases against Defendants were settled in 1997. The shares of the initial payment (equal to about 1% of the total settlement) were computed on the companies' share of total market capitalization. Subsequent annual payments were allocated based on market share. Plaintiffs argue that it was against the economic self-interest of Philip Morris to agree that the up-front payments be based on market capitalization rather than market share. *See* Pls.' Resp., at 64.

Michael Syzmanczyk, CEO of Philip Morris, however, testified that Philip Morris' "up-front" payment under the market capitalization agreement was more than it would have been under a market share agreement, but that the company wanted to get the agreement made and negotiated the best terms it believed it could get. *See* Syzmanczyk Depo., at 196–97. There is no evidence that Philip Morris could have settled on a more favorable basis at that time, and Plaintiffs have proffered no evidence to dispute Mr. Syzmancyzk's testimony. Further, there is no evidence that the relatively small premium paid by Philip Morris

in the initial installment was an unreasonable price for litigation peace. Plaintiffs' theory seems to be that Philip Morris was rewarding its co-conspirators for their participation. Plaintiffs, however, fail to note that B & W paid nearly 18% of the initial payment although its market share was only about 13%. As their thesis does not take into account all the known facts, it fails to create an inference of any sort.

### e. "Excessive" Price Increases After Settlement Agreement

 Plaintiffs allege that after state settlements, Defendants raised prices identically which benefitted the other Defendants more than Philip Morris. Defendants contend that Philip Morris should have used its stronger cash position to keep prices low and increase market share. Plaintiffs, however, provide no evidence for this position other than their own speculation. *See* Pls.' Resp., at 65 ("at the time of the Master Settlement Agreement, industry analysts questioned whether PM would immediately raise prices to pay for the settlement, or take advantage of its superior cash flow position to gain market share.").

Plaintiffs have offered no testimony, expert or otherwise, that Philip Morris would have been in a better economic position had it strived for market share. The undocumented speculation of industry analysts is insufficient to show that Philip Morris acted against its own economic self-interest in raising prices after the settlement agreement.[36] Strangely, Plaintiffs cite an internal review by B & W for the proposition that a price war breaking out after the Master Settlement Agreement was the "most rational and economically sound scenario." *See* Pls.' Resp., at 66. In fact, the document states the complete

---

**36.** The internal review conducted by Philip Morris, and cited by Plaintiffs, is not to the contrary. In that report, Philip Morris speculates that RJR might benefit more from the

settlement agreements in 1997, but that Philip Morris would have the advantage over its competitors in 1998. *See* PMAT000211925.

opposite. *See* BW461105009–10 (noting that after the Master Settlement Agreement, industry pricing had two different options: "One view is that the higher base price level mandated by the settlement or [Federal Excise Tax] will provide an umbrella for higher manufacturer's price increases. The other is that lower industry volume, excess capacity, and the intensely competitive nature of the manufacturers will result in a 'price war' that will last until fewer companies are left standing than exist today. The latter view has the benefit of representing a more classical economics viewpoint *but appears irrational.* The former view, on the other hand, appears a bit starry-eyed.") (emphasis added). Accordingly, Plaintiffs presented no evidence from which an inference could be drawn that price increases after the settlement agreements were against the economic interest of Philip Morris.

### 6. Nature of Market

■ Plaintiffs argue that the "economics of the marketplace" is a plus factor because the "cigarette industry's structure is particularly conducive to cartel activity." Pls.' Reps., at 29. Plaintiffs point to the following aspects of the cigarette industry to support their claim: (1) highly concentrated market, (2) fungibility of cigarettes, (3) high barriers to entry, (4) absence of close substitutes, (5) industry's history of collusion, and (6) conspiratorial meetings in other markets.

■ Plaintiffs' first four factors, however, are simply statements of the characteristics of an oligopolistic market and, thus, are not plus factors that tend to exclude the likelihood that Defendants were engaged in competitive conduct. Plaintiffs next argue that the court should consider the tobacco industry's history of collusion. *See id.* at 31. In support of this contention. Plaintiffs cite *United States v. The American Tobacco Co.,* 221 U.S. 106,

31 S.Ct. 632, 55 L.Ed. 663 (1911), and *American Tobacco Company v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). The law generally disfavors use of such "historical" evidence. *See* Areeda, ¶ 1421a, at 125 ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy."); *see also* Fed.R.Evid. 404(b). Furthermore, Plaintiffs are not alleging that the prior conspiracy in the 1940s is continuing today. *See* Second Amended Complaint, ¶¶ 38–46 (where Plaintiffs describe competition in the industry from 1980–1993 and allege that the early 1990s were marked by competitive activity due to the introduction of discount cigarettes). Plaintiffs have cited no case law, and the court has found none, where "history of collusion" is used as a plus factor courts consider in cases alleging illegal collusion in an oligopolistic market. The court finds that the "history of collusion" in the industry does not tend to exclude the possibility that Defendants were engaged in lawful conduct during 1993 through 2000. Thus, the "nature of the market" is not a "plus factor."

■ Finally, Plaintiffs appear to allege that the multinational nature of Defendants' businesses should be a "plus factor." Plaintiffs first cite to Dr. Fisher's expert report noting that "it is a well known proposition in economics that multi-market conduct can improve firms' abilities to sustain agreements and coordinate by raising the cost of cheating." Pls.' Resp., at 32 (quoting Fisher Report, ¶ 116). The court finds this statement irrelevant for the proof of a likely conspiracy during the time period in question. Taken to its logical conclusion, Plaintiffs appear to ask the court to find the existence of multinational corporations to be a "plus factor." Given the global nature of the economy, such a finding would substantially alter the legal landscape of antitrust analysis in an oligopolistic market. Plaintiffs then seem to

narrow the focus of their argument and contend that "[a]ll Defendants other than Lorillard held meetings and had other contacts in various locations through the world, at which they agreed to fix prices, allocate territories and/or fix terms and conditions of sale." *Id.* (citing evidence collected at Appendix B). The court will address below the lack of evidentiary and legal support for Plaintiffs' allegations regarding Defendants' conspiratorial meetings in other markets. *See infra.*

### 7. Strong Motivation

 Plaintiffs argue that Defendants had a motive to conspire because of (1) declining demand and excess production capacity, (2) increased litigation and regulatory pressure, and (3) the destabilization of the market by introduction of discount cigarettes, so-called "commoditization." Specifically, Plaintiffs contend that Philip Morris believed that discount cigarettes would destroy its Marlboro brand and cause Philip Morris to lose its industry leadership position. Lorillard, though smaller, was in a similar market position because its premium cigarette, Newport, was its only significant brand.

As an initial matter, the court notes that the characterization of motive as a "plus factor" is questionable. Professor Areeda noted that "[c]onspiratorial motivation in the sense of a reasonable prospect of increasing profits through collective action is a logical corollary of interdependence.... Motivation is thus synonymous with interdependence and therefore adds nothing to

it." *Id.,* ¶ 1434c1, at 215; *see also In re Baby Food,* 166 F.3d at 122 (noting that the concept of "conspiratorial motivation" is ambiguous because it merely restates the interdependence that characterizes an oligopolistic market).[37]

Moreover, there are numerous logical inconsistencies with Plaintiffs' position. Plaintiffs contend that Philip Morris and Lorillard, on the one hand, and RJR and B & W, on the other, had differing reasons for being "desperate" in the early 1990s. The fact that these companies had different market position and motivations undercuts Plaintiffs' theory that there was a common industry-wide motive to form a conspiracy. Furthermore, Plaintiffs' allegation that due to discount cigarettes, Philip Morris "desperately needed to take action to protect its leadership of the cigarette industry," Pls.' Resp., at 34–35, explains *Philip Morris'* motivation for Marlboro Friday, an act Plaintiffs agree was pro-competitive, but certainly does not give an industry-wide motivation. Thus, the "commoditization" Plaintiffs allege was not an external force that befell the cigarette industry; rather it was RJR and B & W that began to stake out space in the discount market. To these companies, the "commoditization" of the cigarette industry was not indicative of "desperate times," but rather was a purposeful market strategy.[38] It makes no sense, therefore, that the "solution" to such a "problem" would be an industry-wide conspiracy.[39]

Furthermore, Plaintiffs themselves contend that both declining demand, excess

---

**37.** *In re Medical X–Ray Film,* 946 F.Supp. 209, cited by Plaintiffs, is not to the contrary. There, the court found that "the presence or absence of a strong motive to enter into the alleged conspiracy" could be a "plus factor" under the circumstances. *Id.* at 218.

**38.** As discussed, Marlboro Friday forced these companies to reexamine the wisdom of that strategy.

**39.** The court addressed above Plaintiffs' allegation that if RJR had continued to push for a market share in the discount segment, it could have been the overall new market leader by 1997.

capacity, and destabilization by discount cigarettes had been features of the cigarette industry since 1980. *See* 1994 Annual Meeting Q & A Book, PMAT300006144 ("The industry has been declining since 1981. We estimate the industry will continue declining at an annual rate between 2% and 2.5%."); Elzinga Depo., at 104 (testifying that since 1980 cigarette industry had excess capacity). Plaintiffs offer no explanation as to why the situation in 1993 had changed so dramatically as to require conspiratorial action that was not deemed necessary in the "competitive" years of 1980–1993. *See* Second Amended Complaint, ¶¶ 38–46. Accordingly, the court finds that Plaintiffs have not presented evidence from which a reasonable inference could be drawn that Defendants' "strong motivation" proves the existence of an express agreement to fix prices, nor does it tend to exclude the possibility of competitive conduct. Plaintiffs' argument essentially contends that a murder may be assumed from the fact that a destitute heir would benefit from the death of a relative. The reasoning, of course, is fallacious and results from assuming talismanic significance of anything that may ever have been referred to as a "plus factor." The court understands that "plus factors" may but do not always create reasonable inferences.

### 8. Reduction in Price Tiers

■ Plaintiffs argue that Defendants reduced the number of price tiers for cigarettes to facilitate coordination of the price-fixing conspiracy. Specifically,

Plaintiffs note that prior to Marlboro Friday, there were "at least 10 different price points within three or four tiers for cigarettes at the wholesale level." Pls.' Resp., at 47. By August 1993, Plaintiffs contend, there were only two main price tiers at wholesale, and nonpremium categories were consolidated into one price point. *Id.*

Plaintiffs provide no support for their contention that a consolidation of price tiers under the circumstances presented here constitutes a "plus factor." Although Dr. Fisher opined that reduction in the number of price tiers makes coordination of price increases easier, *see* Fisher Rebuttal, ¶ 64, he also testified that Philip Morris' purpose in its Marlboro Friday strategy was "to reduce the price gap between premiums and discount cigarettes to avoid an erosion of share as people switched from premiums to discounts because of price." Fisher Depo., at 31. Dr. Fisher agreed that Philip Morris had "legitimate business justifications for its Marlboro Friday announcement." *Id.* at 39; at 46 (Philip Morris had legitimate business reason for narrowing the price gap to benefit its premium brands). Plaintiffs have not presented evidence from which a reasonable inference could be drawn that Defendants reduced the number of price tiers to facilitate their conspiracy, particularly in light of Dr. Fisher's ambiguous testimony on this issue. The fact that the reduction of price tiers *could* facilitate a conspiracy does not tend to exclude the possibility that Defendants were engaged in competitive conduct and the court finds it is not a "plus factor." [40]

40. As they do on numerous occasions, Plaintiffs attempt to divide the competitive act of Marlboro Friday from its logical consequences. Plaintiffs argue that "[p]art of PM's strategy *after* Marlboro Friday was to reduce the number of price points and to reduce the price gap." Pls.' Resp., at 47 (emphasis added). The reduction of price points and the price gap was not a policy that arose independently *after* Marlboro Friday; it was one of the goals of Marlboro Friday. *See* Fisher Depo., at 31. Plaintiffs again contend that "after Marlboro Friday, PM was intent on destroying the deep discount segment, to the detriment of its competitors and consumers generally." Pls.' Resp., at 47. This contention, however, does not support Plaintiffs' theory of a conspiracy. If the destruction of the deep discount segment was harmful to Philip

### 9. Opportunities to Conspire

Plaintiffs argue Defendants had numerous opportunities to conspire through the Tobacco Institute, which hosted regular meetings of the top leadership of tobacco companies, and the Institute's Committee of Counsel, consisting of the General Counsels of all of the major cigarette companies. Plaintiffs also contend that Defendants had opportunities to conspire during the attempted settlement negotiations of the state healthcare lawsuits. Finally, Plaintiffs assert that there were social contacts between the tobacco company executives such as golf, dinner, lunches, trade association conferences, and teleconferences.

Plaintiffs cite *In re Medical X–Ray Film*, 946 F.Supp. at 218, for the proposition that "opportunities to conspire" is a plus factor. In *In re Medical X–Ray Film*, however, the court was faced with numerous meetings during which the plaintiffs could demonstrate that pricing information was exchanged. As such, *In re Medical X–Ray* is distinguishable.[41] Furthermore, the Eleventh Circuit has held that "the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy." *Todorov*, 921 F.2d at 1456; *see also Blomkest*, 203 F.3d at 1036 (opportunity to conspire "not necessarily probative evidence of price-fixing conspiracy"); *In re Citric Acid*, 191 F.3d at 1103 (opportunities to conspire are insufficient to support an inference of conspiracy because they "do not tend to exclude the possibility of legitimate activity"); *In re Baby Food*, 166 F.3d at 126 (finding that "communications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of an agreement, tacit or otherwise' "); Areeda, ¶ 1417b, at 97 (when considering opportunities to conspire "it remains the plaintiff's burden to prove that the defendant succumbed to temptation and conspired. It is not enough to point out the temptation and ask that the defendants bear the onerous, if not impossible, burden of proving the negative that no conspiracy occurred.").

Here, Plaintiffs have proffered no evidence that pricing discussions took place at any of the meetings of the Tobacco Institute or its Committee of Counsel. In fact, Mr. Meyer testified specifically they did not. *See* Meyer Depo., at 68–70. Nor have Plaintiffs shown that Defendants discussed pricing during the meetings to settle the state healthcare lawsuits.[42] Finally,

Morris' competitors, it could hardly be one of the practices which facilitated the operation of the alleged cartel.

**41.** For the same reasons, the court finds inapposite *In re Plywood Antitrust Litigation*, 655 F.2d 627 (5th Cir. Unit A 1981). There, the plaintiffs offered evidence of a series of meetings between plywood producers that the producers themselves described as "an opportunity to secure specific competitive information." *Id.* at 633. Specific pricing information was exchanged. *Id.* at 633–43. The court held that the parallel pricing conduct plus "the numerous items of direct evidence of communication between high-level personnel *on pricing policy* adequately supported the jury's verdict." *Id.* at 634 (emphasis add-

ed). Here, Plaintiffs have not shown that pricing policies were the subjects of any of the meetings among Defendants.

**42.** Although Plaintiffs contend that statements of Mr. Geoffrey Bible, CEO of Philip Morris, illustrate the companies' desire to "pass through" settlements costs in the form of pricing, the specific comments Plaintiffs point to were made during failed settlement negotiations in 1997 which anticipated government involvement and an antitrust immunity provision for Defendants. Furthermore, as the court described above, Mr. Bible's comments were not related to price, but were made in the context of discussing the costs of the settlement agreement allocated based on market share, not pricing.

Plaintiffs have not demonstrated that at any pricing issues were discussed at the social engagements among the tobacco company executives. The sum total of Plaintiffs' contentions about whether these meetings involved discussions of pricing is the following:

> The Committee of Counsel met frequently, as did the numerous other committees that were part of the Tobacco Institute. It was through these committees that the most sensitive topics—legal, health-related, etc.-were discussed within the industry. It is not unreasonable *to assume* that the future price of cigarettes was among the topics discussed during some of these meetings.

Pls.' Resp., at 55–56 (emphasis added).[43] The court, however, cannot credit assumptions.[44] Accordingly, the court finds that Plaintiffs have not presented evidence from which a reasonable inference could be drawn that "opportunities to conspire" tend to exclude the possibility that Defendants were acting lawfully. As such, "opportunities to conspire" is not a "plus factor" under the circumstances presented here.

### 10. Pricing Decisions at High Levels

Plaintiffs argue that restricting pricing decisions to high level officials only is a "key requirement in any agreement to restrain trade," Pls.' Resp., at 57, and thus argue that the "restriction of decisions on pricing levels and timing is a further factor

supporting an inference of conspiracy." *Id.* Specifically, Plaintiffs contend that at Philip Morris only the CEO had authority to authorize and determine the timing of price increases. Similarly, at B & W, only the CEO, marketing director, and CFO would discuss potential price increases.

Plaintiffs, however, provide no authority for their contention that limiting pricing decisions to high levels is a "plus factor," let alone whether it facilitates a conspiracy. In fact, in *Harcros*, the Eleventh Circuit deemed such evidence to be equivocal and, therefore, not a "plus factor" in a conspiracy analysis. There, the plaintiffs proffered a memo which showed that Joe Ragusa, a regional vice president for one of the defendants, "exercised strict control over chlorine pricing." *Id.* at 569. The court found that such a memo could support an inference that Ragusa could not get his subordinates to follow instructions as easily as it could show that pricing was centralized with Ragusa in order to conceal a conspiracy. As such, the court found this evidence in "equipoise" and not sufficient to withstand defendants' motion for summary judgment. *Id.* Furthermore, Plaintiffs provide no evidence that the pricing at either RJR or Lorillard was similarly limited to high level employees. Plaintiffs' argument that to "effectuate such a conspiracy, pricing authority must be limited to a few select, high-ranking officials in *each* conspiring company,"*see*

---

**43.** The slim reed upon which Plaintiffs base this assumption is the deposition testimony of William Campbell, former President and CEO of Philip Morris, whom Plaintiffs quote as saying the Tobacco Institute "[n]eed[ed] to increase even more the continuing cooperation by the members." Campbell Depo., at 287–88. As Defendants demonstrate, however, a full reading of Mr. Campbell's testimony indicates he was not referring to cooperation on issues of price. Rather Mr. Campbell testified that "[m]ost of these discussions were the type that, you know, how the organization

could be strengthened in its industry efforts against things like the Federal Excise Tax and indoor air and so on." *Id.* at 288. In fact, Mr. Campbell testified that prices were never discussed at Tobacco Institute meetings. *Id.* at 296–97.

**44.** As described above, although Plaintiffs claim they "were never given complete access to Committee of Counsel records to determine the existence of additional direct evidence of collusion," Pls.' Resp., at 56 n. 30, the court finds otherwise.

Pls.' Resp., at 57 (emphasis added), loses force when Plaintiffs do not demonstrate that the policy was limited in this manner in each company. Thus, the court finds here that Plaintiffs have not presented evidence from which a reasonable inference could be drawn to show that the restriction of pricing discussion to high level employees is a "plus factor."

### 11. Smoking and Health Conspiracy

Plaintiffs contend that Defendants have engaged in a "smoking and health conspiracy" whereby Defendants have agreed to limit health-based marketing of cigarettes. Plaintiffs assert that the smoking and health conspiracy is a "plus factor" because Defendants are able to facilitate coordination in their price-fixing conspiracy by suppressing product differentiation. See Pls.' Resp., at 58–59.

Specifically, Plaintiffs allege that in the 1950s the cigarette companies decided to deal cooperatively with the "health crisis," the decline in cigarette consumption purportedly related to the first medical studies linking smoking with disease. See Pls.' Resp., at App. C. Plaintiffs contend that the CEOs of American Tobacco, RJR, Philip Morris, Benson & Hedges, and B & W met in New York to discuss the problem. They received advice from a public relations firm that the companies should reach an understanding that no one would seek a competitive advantage on the basis of health issues. Plaintiffs further note that in 1957 when U.S. Tobacco advertised its "King Sano" brand as being "low-tar," the Chairman of Philip Morris said that such advertising was not consistent with what the industry had been doing. Id.

Plaintiffs also cite a 1983 cigarette advertisement run by RJR and Philip Morris in the Netherlands which raised doubts about the tar and nicotine levels represented by B & W for its "Barclay" brand of cigarettes. B & W informed its companies that this was the first time another company had attempted to use health to gain a competitive advantage. Plaintiffs assert that B & W's parent company, the British American Tobacco Company, eventually reached an agreement with Philip Morris not to undertake this kind of advertising in the future. Plaintiffs further contend that the cigarette companies agreed to share the results of biological research and not independently attempt to produce a "safer" cigarette.

These allegations, however, all occur outside the time frame of the conspiracy alleged by Plaintiffs and thus are not probative as to the claims made in Plaintiffs' complaint. To bolster their claims, though, Plaintiffs' expert contends that even if these alleged non-price agreements were no longer in place during the time period relevant in the instant lawsuit, the historic "smoking and health" agreements facilitated price coordination in the relevant period. See Fisher Report, ¶¶ 130–33. A review of the evidence examined by Dr. Fisher, however, shows that Dr. Fisher either assumed the current existence of such a conspiracy or merely speculated as to the current effects of a past conspiracy. Dr. Fisher first opines that "actions taken to reduce the real or perceived health-based differences between products are important for facilitating coordination on price." Id., ¶ 133. But in rendering this opinion, Dr. Fisher assumes such a conspiracy exists and does not relate his opinions to any evidence of a current "smoking and health conspiracy." Furthermore, as the court described above, it is not clear that the possibility that an activity that "facilitates coordination" is sufficient to constitute a "plus factor." Production of evidence to show that something could happen creates no inference that it did happen.

Dr. Fisher then reviews historic allegations of the cigarette industry limiting

health-based marketing, *see id.*, ¶¶ 134–35, and draws the following conclusions:

> It is entirely *possible* that firms' decisions to limit health-based marketing in the past continued to be felt between 1993 and 2000. Such decisions *may* have checked companies' incentives to vigorously pursue health-related research. To the extent that health-related innovations were retarded as a result, cigarettes *would have* exhibited a higher degree of homogeneity between 1993 and 2000 than they would have otherwise. Similarly, firms limited their health-based advertising in the early to mid 1990s, which *may have* served to maintain perceived homogeneity. As explained above, greater homogeneity facilitates coordination on price. Thus *to the extent* that firms' decisions resulted in greater homogeneity between 1993 and 2000, it *would have* facilitated coordination on price in those years.

*Id.*, ¶ 136 (footnotes omitted and emphasis added). This paragraph addresses only possibilities and certainly does not tend to exclude the possibility that Defendants were engaged in lawful conduct. In order to draw an inference of conspiracy in this testimony, a jury would have to engage in such speculation that its finding would be a "guess or mere possibility." Accordingly, the court finds that Plaintiffs' allegations of a smoking and health conspiracy are insufficient to constitute a "plus factor."

At the conclusion of their smoking and health conspiracy discussion, Plaintiffs remark that they "have had no discovery of Defendants' activities between 1983 and the present, and no discovery of any information relating to 'smoking and health.'" App. C, at 7. The court, however, did permit Plaintiffs to seek discovery on

these matters in the relevant time frame. After a hearing, the court addressed the dispute between the parties regarding "non-price" discovery and ordered that Plaintiffs could take discovery on:

> alleged anticompetitive agreements among Defendants during the time period of May 1, 1992 through February 8, 2000 to (1) refrain from competing with regard to the health and safety aspects of their products, (2) refrain from advertising on the basis of health and safety, or (3) restrict research and development activities that might lead to the production of a safer cigarette.

Order, August 22, 2001, at 2. The court also permitted Plaintiffs to serve requests for production and interrogatories and to take nine depositions on "non-price" issues. *Id.* at 2–3. Additionally, the court extended the existing discovery deadlines by sixty (60) days to accommodate Plaintiffs' "non-price" discovery. *Id.* at 3–4.[45]

## · 12. Foreign Conspiracies

■ Plaintiffs contend that they have "discovered extensive evidence of anticompetitive activity in countries outside the United States, including explicit price-fixing agreements in many countries involving British American Tobacco Co., an affiliate of B & W, and Philip Morris International, an affiliate of Philip Morris U.S.A." Pls.' Resp., at 58. Plaintiffs then allege that "[s]ome examples of anticompetitive agreements are identified in Appendix B." *Id.* At Appendix B, Plaintiffs list documents relating to the following countries: (1) Argentina, (2) Canada, (3) Costa Rica, (4) El Salvador, (5) France, (6) Guatemala, (7) Saudi Arabia, Gulf States, (8) Hungary, (9) Panama, and (10) Venezuela. Finally, Plaintiffs avow that the "listing is not intended to be exhaus-

---

45. In fact, Defendants did respond to discovery requests made by Plaintiffs on the smoking and health issues. Plaintiffs deposed two witnesses from RJR. Although the depositions were noticed by Plaintiffs, Plaintiffs cancelled those depositions. *See* Philip Morris Reply Brief, at 26 n. 25.

tive, either in terms of countries involved or of evidence available. Rather, it is intended to demonstrate a pervasive pattern of anticompetitive behavior engaged in by the Defendants or their affiliated companies." App. B., at 1.

Earlier in this litigation, Plaintiffs sought leave from the court to conduct discovery about Defendants' activities in foreign markets. After several hearings, the court instructed that

> Plaintiffs shall be permitted to serve new discovery requests relating to price-fixing episodes in foreign countries, provided that plaintiffs first make the following showing to the Court with respect to each country: (1) plaintiffs must show that under clearly-established statutes of the foreign jurisdiction, or, if the country is a common law jurisdiction, under the common law of the jurisdiction, an agreement between or among competitors to fix prices violated the law of the country where the agreement was made at the time of the alleged unlawful activity in that country; and (2) plaintiffs must identify by direct evidence one or more price fixing episodes in that country during the operative discovery period (May 1992—January 2000) or that continued into the operative discovery period.

Order, Feb. 13, 2001, at 5–6. Subsequently, Plaintiffs filed a motion seeking discovery of Defendants' activities in Hungary, France, Argentina, Venezuela, and Panama. After full briefing on Plaintiffs' motion seeking discovery and a lengthy analysis of materials, the court concluded that

> price-fixing agreements were not at all times unlawful under the laws of the countries referenced by Plaintiffs. In fact, as the relevant laws are understood by this court, the jurisdictions in question generally analyzed price-fixing

agreements under a "rule of reason" approach that considered various factors in determining whether such agreements were illegal. For the finder of fact to draw the inferences permissible under Rule 404(b) with regard to these jurisdictions, the court would need to conduct mini-trials on Defendants' conduct in each of the countries at issue. Such a course of action would violate Rule 403 by causing unfair prejudice to Defendants, confusing the issues, and resulting in undue delay of this litigation.

Order, June 15, 2001, at 8. Accordingly, the court denied Plaintiffs' motion to conduct foreign discovery.

Now, at the summary judgment stage, Plaintiffs reassert that they have "extensive evidence of anticompetitive activity" by Defendants in Hungary, France, Argentina, Venezuela, and Panama. *See also* Plaintiffs' Post–Hearing Submission in Opposition to Defendants' Motions for Summary Judgment, at 12 n. 22. Plaintiffs fail, however, to address the court's previous ruling that "price-fixing agreements were not at all times unlawful under the laws" of these countries. Furthermore, Plaintiffs baldly contend that Defendants, or their affiliates, undertook anticompetitive price fixing agreements in Canada, Costa Rica, El Salvador, Guatemala, and Saudi Arabia (Gulf States). Nowhere do Plaintiffs describe the legal landscape in these countries that would make any such activities unlawful, nor do Plaintiffs do any more than cite to documents in describing the nature of these alleged anticompetitive activities. This is simply too thin a reed upon which to allege that Defendants' "foreign conspiracies" are a "plus factor" in the instant litigation.[46]

 Perhaps recognizing the court's previous holding that Plaintiffs had

---

**46.** Plaintiffs also contend that Dr. Fisher addresses the significance of these activities in

his reports, finding that "multi-market con-

not presented evidence sufficient to warrant further discovery, Plaintiffs also assert that this evidence is probative of motive, opportunity, or intent under Federal Rule of Evidence 404(b). However, as the court previously explained in its order on Plaintiffs' motion for leave to conduct foreign discovery, Rule 404(b) allows jury inferences only where the compared conduct is closely analogous to the conduct at issue in the instant suit. *See, e.g., United States v. Crockett,* 514 F.2d 64, 72 (5th Cir.1975) ("important consideration" in balancing probative value of extrinsic evidence against prejudicial effects is "whether the other acts are closely connected in time and nature to the offense charged"). Here, Plaintiffs' very brief comments on the alleged anticompetitive acts in foreign markets fall far short of such a showing. Accordingly, the court finds that Plaintiffs have presented no admissible evidence from which a jury could infer that Defendants operated unlawful conspiracies in foreign markets. Thus, Plaintiffs cannot show that "conspiracies in foreign markets" is a "plus factor."

### C. Summary of Plaintiffs' Evidence

### 1. Nature of Agreement

Plaintiffs have proffered little on their theory of the nature of Defendants' agreement in violation of Section 1 of the Sherman Act. Plaintiffs allege a rather complex conspiracy, contending that Defendants agreed on "(1) reduction of price tiers to only two: premium and discount; (2) maintenance of the 'price gap' at an absolute constant, which would result in a diminishing percentage gap between premium and discount as prices were raised; (3) limitation of discounting and promotions on non-premium cigarettes; (4) moderate increases of all prices; (5) recognition of PM's price leadership; (6) participation in programs to share and monitor volume, price, and discount information; (7) output restrictions; and (8) ceding some market share to PM." Pls.' Resp., at 13.[47] Yet, Plaintiffs offer little as to their thoughts of how the conspiracy operated.[48]

---

tact facilitates a conspiracy in the United States because it decreases the likelihood that competitors will, for example, violate the agreement in the United States for fear of endangering anticompetitive agreements in other countries." Pls.' Resp., at 58. The court, however, has determined that Plaintiffs' allegations of foreign market conspiracies are not probative of collusion as a matter of law. The testimony of Plaintiffs' expert does not alter that conclusion. *See Blomkest,* 203 F.3d at 1038 (finding expert's opinion was "not probative of collusion" and holding that under Federal Rule of Evidence 703, there must be "sufficient facts already in evidence or disclosed by the witness as a result of his or her investigation to take such expert testimony out of the realm of guesswork and speculation").

**47.** Plaintiffs cite two B & W documents to support their description of an eight-part conspiracy. Neither document describes any such agreement. *See* B & W462219869–999 (B & W Five Year Plan 1992–1997); B &

W970394991–4996 (unidentified handwritten notes).

**48.** For the first time, in their Post–Hearing Submission in Opposition to Defendants' Motions for Summary Judgment, Plaintiffs give the court some indication of their speculation as to how such an agreement might have operated. Plaintiffs assert "[a]lthough presumably there was no agreement at the outset that specific companies (like B & W) would reduce their shares of the market in specific amounts, the necessary consequence of the agreement was that some would lose and others would gain share." *Id.* at 10. "B & W did not necessarily agree in advance to the reduction [in market share] it experienced; however when faced with its pre-conspiracy losses, it acquiesced to a loss (one that would not be inconsistent with its prior loss trend) in exchange for larger per-pack profits resulting from the conspiracy." *Id. at 10 n. 20. This* new theory, however, is clearly inconsistent with Plaintiffs' speculation at oral argument where they alleged that B & W agreed to the

Dr. Fisher offers no theories as to the manner in which this particular alleged agreement could have been implemented over the course of seven years but rather focuses on the "plus factors." The gravamen of Dr. Fisher's opinion relates to how certain practices in the cigarette industry would have facilitated an agreement. Dr. Fisher's opinion does not tend to exclude the possibility that Defendants were engaged in lawful competitive conduct.

 Plaintiffs' overarching theory that Philip Morris designed and encouraged the conspiracy cannot stand up to scrutiny. Plaintiffs contend "Marlboro Friday raised the threat of a potentially ruinous price war that could have driven *some* defendants from the market. PM extended an alternative: cooperate through a new joint pricing regime in order to collectively recover from the desperate situation created through a decade of price competition." Post–Hearing Submission in Opposition to Defendants' Motions for Summary Judgment, at 10–11 (emphasis added). After Marlboro Friday, however, there was no incentive for Philip Morris to organize a cartel. Philip Morris achieved what it wanted in Marlboro Friday—reducing the price gap between premium and discount cigarettes and protecting the Marlboro brand. *See* Corporate Affairs Speech by Larry Wexler, PMAT000066439–63 (discussing that the primary lesson of Marlboro Friday was managing the price gap). Philip Morris was not one of the defendants who could be driven from the marketplace by a "potentially ruinous price war." Philip Morris reacted to the allegedly "desperate" situation of price competition with its Marlboro Friday strategy.

There was no reason for it to "extend an alternative" to the other companies after Marlboro Friday, particularly if, as Plaintiffs allege, B & W and RJR were facing elimination from the cigarette industry.

Plaintiffs repeatedly contend that Philip Morris described the industry as being in a "cycle of despair." Pls.' Resp., at 9; Oral Argument, at 64–65, citing PMAT000066439–63, at 444–46, Corporate Affairs Speech given by Larry Wexler, November 7, 1995. A review of this document, however, clearly shows that this "cycle of despair" was Philip Morris' opinion of the growth of the discounting segment. Philip Morris believed that discounting was not economically viable because it was paid for by increasing costs of premium cigarettes. B & W and RJR, who had been gaining share through discount cigarettes, did not share Philip Morris' opinion on these matters. As such, there was no industry-wide "cycle of despair" behind which Philip Morris could "rally the troops" to form a cartel. Philip Morris unilaterally dealt with this "cycle of despair" through its actions on Marlboro Friday. *See* PMAT000066444 ("We concluded that Philip Morris U.S.A. had to act decisively in response to the Discount challenge and break the 'Cycle of Despair.' "). Philip Morris' actions on Marlboro Friday, as Plaintiffs concede, were entirely pro-competitive. Plaintiffs' repeated citation to a "cycle of despair" does not change that undisputed fact.

What Plaintiffs fail to recognize, again, is that Marlboro Friday changed what could be "expected" in the cigarette industry. Philip Morris showed that it was willing to sustain substantial losses in or-

conspiracy so that it would not be driven out of the marketplace by Philip Morris' actions on Marlboro Friday. *See* Oral Argument, at 88. Moreover, this argument is inconsistent with the facts. B & W's market share was not trending down in the years leading up to

the conspiracy and thus B & W had no "pre-conspiracy losses" to contend with or give it reason to join a conspiracy. *See* Annual Shares of U.S. Tobacco Shipments by Manufacturer, 1980–2000, Plaintiffs' Exhibits Presented at Oral Argument, at 15.

der to protect its premium brand, Marlboro, and stem the flow of market share to the generic brands. It was Philip Morris' act which brought the market back into the "stability" Plaintiffs allege was a result of collusion. This act, however, as Plaintiffs admit, was highly competitive. Thus, it is difficult to fashion an explanation for how a competitive act shows evidence of a conspiracy.

The utter lack of any evidence, circumstantial or otherwise, that Lorillard joined in the alleged conspiracy also casts doubt upon Plaintiffs' theory. In fact, Plaintiffs' expert recognized that not enough attention had been paid to Lorillard:

Q: Since Lorillard made no public announcements that you are aware of, was engaged in no actual collusive discussions of which you are aware, had legitimate reasons for gathering the monitoring information that it did, was not engaged in the foreign markets, and had initiated its own permanent allocation program during a period of more intense price competition in March 1990, what evidence, sir, do you have that Lorillard engaged in conduct that had the effect of suppressing prices at wholesale from 1993 to 2000?

MR. REINHARDT: Objection as to form.

A: It's a fair question, and I certainly perceive that I haven't concentrated sufficiently on Lorillard.

It went along with price increases, but I understand the proposition that says that that may be just oligopolistic rationality, even if the others, by the

way, even if the others have fixed it to make that coordination more easy. I am going to have to think about that. Fisher Depo., at 471–72.

At oral argument, Plaintiffs contended that Lorillard's participation in the monitoring programs of MSA/Pittsburgh is sufficient to connect it with the alleged conspiracy. *See* Oral Argument, at 96–97. The parties dispute the level of evidence necessary to connect Lorillard with the conspiracy with Plaintiffs contending that they need only "slight evidence." *See* Pls.' Resp., at 76–77 n. 36 (citing *United States v. Wilkinson,* 754 F.2d 1427, 1436 (2d Cir. 1985)).[49] Regardless of the specific amount of evidence Plaintiffs would need to adduce to sufficiently connect Lorillard, individually, to the conspiracy, the fact that Plaintiffs contend the four Defendants gathered together to form an agreement to fix prices and yet have proffered relatively no evidence about Lorillard's participation in the conspiracy diminishes the force of Plaintiffs' argument with respect to all four Defendants.

■■■ At oral argument, Plaintiffs put a new spin on their theories, using the Supreme Court's opinion in *Brooke Group* to assert what they contend is how the cigarette industry "should have" looked from 1993 to 2000, if it were competitive. A complete reading of Plaintiffs' argument, however, essentially boils down to an assertion that there must have been collusion in the cigarette industry because the price war that existed in the early 1990s ended sometime in 1994. *See* Oral Argument, at 59–69. In fact, Plaintiffs' counsel argued

---

**49.** The "slight evidence" rule, however, is not favored in the Eleventh Circuit. *See United States v. Toler,* 144 F.3d 1423, 1427 (11th Cir.1998) (explaining that "slight evidence" rule was "banished" from circuit jurisprudence). Furthermore, it is not clear that the "slight evidence" rule would apply in a civil conspiracy case on summary judgment. *See*

*In re Citric Acid,* 996 F.Supp. 951, 955 (N.D.Cal.1998) (holding "slight evidence" rule may apply in criminal matters but cannot in civil cases because its standard would conflict with standard for summary judgment), *aff'd, In re Citric Acid,* 191 F.3d 1090 (9th Cir.1999).

that their basis for collusion was that after Marlboro Friday, the cigarette industry returned from a "competitive industry" to "a market that behaved like a traditional normal oligopoly." *See id.* at 69. Plaintiffs' counsel also argued:

> What we have here is a change in a course of dealing over a decade where you went from a market which was characterized by relative price competition and a widening gap between premium brands and discount brands to a period marked again in the words of their expert by the dropping of a sledgehammer, which produced stability in prices and price coordination.

*Id.* at 59. *See also id.* at 73–74 ("It's that course of conduct and dealing where we change a nonparallel pricing oligopoly into a parallel pricing oligopoly . . . ."). There is, however, nothing illegal about a "traditional normal oligopoly."

 All of the acts of which Plaintiffs complain can be equally explained by Philip Morris exercising its market power as by a collusive agreement among Defendants. The fact that Philip Morris exercised its market power by using its nearly 50% share of the market is not enough to infer that Philip Morris and the remaining Defendants entered into an agreement to fix prices. Moreover, the nature of an oligopoly teaches that when there is a strong market leader, that leader will be the price leader and other market players will often raise prices along with the market leader in order to increase their profit. *See supra.* Again, this is simply an economic description of the interdependent activities in an oligopolistic market and not illustrative of an agreement among competitors. Furthermore, a desire to end a price war is not evidence of collusion. *See In re Citric Acid,* 191 F.3d at 1101 (accepting as explanation for defendant's decision not to expand capacity that "it was concerned that an excessively rapid expansion in citric acid supply would undermine prices and wanted to avoid precipitating a costly price war as it had done when it first entered the citric acid market (incurring substantial losses as a result)"). Defendants knew the cost of the price war that culminated in Marlboro Friday. No agreement was necessary for all firms to understand that the losses incurred in a price war were not a desirable result for any of the companies.

 Plaintiffs then seem to contend that the raising of prices itself is indicative of collusion. *See* Oral Argument, at 67–68 ("And the question then becomes at the level of Marlboro Friday where all of the companies were at that time, were they able to increase prices in parallel fashion over that period of time?"). Plaintiffs contend that in a period of excess capacity and declining demand, Defendants should not have been able to raise prices. As noted in *Brooke Group,* however, prices rose during the competitive period of 1980 through 1993 which was also a period marked by excess capacity and declining demand. *See Brooke Group,* 509 U.S. at 213–15, 238, 113 S.Ct. 2578. Furthermore, as discussed below, the evidence shows that from 1993 to 2000 Defendants raised prices at a lower rate of increase than from 1980 to 1993. *See also id.* at 237, 113 S.Ct. 2578 ("rising prices do not themselves permit an inference of a collusive market dynamic. Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of conscious parallelism or supracompetitive pricing."); *Harcros,* 158 F.3d at 572–73 ("Oligopolists behaving in a legal, consciously parallel fashion could achieve high and rising prices, even as costs remained stable, by engaging in price leadership.") (citing Areeda, ¶ 1429, at 176).

Finally, Plaintiffs also attempt to show that the cigarette industry between 1993

and 2000 was the "anti-*Brooke Group*" and therefore must have been the result of collusion. In *Brooke Group*, Liggett alleged that B & W provided volume rebates to wholesalers that amounted to price discrimination as part of a predatory pricing scheme. In the course of its analysis, the Court considered whether pricing increases took place in light of declining demand and excess capacity, the level of retail competition and the number of price tiers in the market, as well as whether "signaling" was used. The Court held that no reasonable jury could conclude that violations had occurred. Plaintiffs contend that because the factors that the court did *not* find in *Brooke Group* were present in the industry from 1993 to 2000, there must have been a conspiracy.

Contrary to Plaintiffs' assertions, the *Brooke Group* world does not look so different from the 1993 to 2000 cigarette market. There was "lockstep" increase in pricing in the "competitive" *Brooke Group* market. *See Brooke Group*, 509 U.S. at 218, 113 S.Ct. 2578 ("after Liggett's June 1985 increase, list prices on generics did not change again until the summer of 1986, when a pattern of twice yearly increases in tandem with the full-priced branded cigarettes was established."); at 235 ("list prices on both generic and branded cigarettes increased twice a year by similar amounts"). The cigarette market during both periods faced declining demand and excess capacity. *See id.,* at 238, 113 S.Ct. 2578. Similarly, in describing the number of tiers in the cigarette market, the Court discussed the difficulty of coordination of a conspiracy where the "net price in the market was determined not only by list prices, but also by a wide variety of discounts and promotions to consumers and by rebates to wholesalers." *Id.* at 239, 113 S.Ct. 2578. This intense retail competition exists in the cigarette market today, just as it did in *Brooke Group*. The *Brooke Group* Court also rejected the plaintiffs' allegations of signaling. *See id.,* at 240–41, 113 S.Ct. 2578.

## 2. Plus Factors and Facilitating Practices

All "plus factors" are not created equal. A "plus factor" must "tend to exclude the possibility that the defendants merely were engaged in lawful conscious parallelism." *Harcros*, 158 F.3d at 572. As the court demonstrated above, the "plus factors" asserted by Plaintiffs do not meet this test. Only four of the "plus factors" proffered by Plaintiffs warranted any particular analysis by the court. Even after such analysis, the court remains unconvinced that Plaintiffs have proffered admissible evidence or evidence from which a jury could make a reasonable inference that tends to exclude the possibility that Defendants were engaged in lawful conscious parallelism. Plaintiffs' bold assertions were often unsupported in the record or belied by their own cited evidence. Defendants proffered much contemporaneous documentation to support their contention that strategic decisions were taken for independent reasons.

The court, of course, is mindful that it cannot view each of Plaintiffs' proffered "plus factors" in isolation, but rather must view the evidence in its entirety. Even applying that standard, however, the court remains unconvinced that Plaintiffs have offered "plus factors" sufficient to exclude the possibility that Defendants were engaged in lawful conscious parallelism. In *Todorov*, the Eleventh Circuit determined that even if a plaintiff could demonstrate a "plus factor," that only creates a rebuttable presumption of a conspiracy that a defendant could defeat with his own evidence. 921 F.2d at 1456 n. 30. *See also In re Baby Food*, 166 F.3d at 122. Assuming, then, that Plaintiffs could establish at least one "plus factor," the court turns to Defen-

dants' evidence to consider whether a presumption of conspiracy could be rebutted.

## IV. REBUTTAL

### A. Uncertainty in the Market

■ Rather than supporting an inference of conspiracy, documents cited by both Plaintiffs and Defendants demonstrate that each of the Defendants was uncertain as to what would happen in the cigarette industry during the time of the alleged conspiracy. In an October 1993 memo from Geoffrey Bible to William Campbell, Mr. Bible discusses different marketing strategies for Philip Morris' brands. After reviewing the possibilities, Mr. Bible notes that "[t]hese are simply guesses. but I'm using them as a starting point." PMAT000144683. "My guess is that the industry is already running below our expectations and that a price increase plus excise tax will accelerate that decline. Can we handle a sales force of the size we have today, can we fund three plants, ought we move more production offshore where we already have fixed investments and overhead would not increase so much?" *Id.* "Normally, I would think Marlboro would recover 6 to 12 months after the excise tax increase as it has elsewhere in the world. But, I fear that smokers here have become accustomed to cheaper brands (a 40% segment) ...." *Id.* These are not the statements of corporate executives engaged in a price-fixing scheme.

Similarly, a November 3, 1993 pricing recommendation memo prepared for William Campbell reflects substantial uncertainty in the market. *See* 2045121128–29. In recommending a price increase, the memo analyzed the risks of a price increase. *See id.* (noting possibility that a competitor could exceed Philip Morris' price increase; could announce a price increase in advance of Philip Morris'; could fail to raise prices at the low end of the

market; or could initiate a mid-year price increase).

Philip Morris' Five Year plan (1996–2000) also focused on market instability. In describing the "assumptions" upon which the plan was designed, the company notes that "[t]wo risks to the Plan are excise tax increases and general market unpredictability—primarily due to the competitive positions of B & W and RJR, and their role within their respective corporations." PMAT500103293. "With regard to unpredictability, a number of situations could cause the marketplace to become more challenging. Competitors could react to share losses with large Discount initiatives, or manufacturers could raise prices beyond the pace at which consumers have the willingness to pay." *Id.*

RJR's 1994–1998 Strategic Plan reflects similar anxiety. *See* 51953 4163 ("Given the high degree of pricing uncertainty due to the potential impact of PM's initiatives on manufacturers' net prices ..."). The document also noted a "high degree of price, volume and mix uncertainty." *Id.* at 4164. This uncertainty remained through the time of the alleged conspiracy. *See* 1996–1998 Strategic Assessment, dated June 1995, 51952 6068–6085, at 6077 ("market disruption due to pricing actions remains huge concern"); at 6080 (" 'Price Wars' continue to be looming threat as players guard and/or develop market positions").

Negotiations leading to the Master Settlement Agreement injected even more uncertainty into the market. B & W noted that it could not determine whether industry volume would decline slowly or drop sharply. *See* Plan Discussion Points, BW461105009. The company also stated:

Whatever our view of industry and B & W volume, our profit outlook will be determined largely by industry pricing.

This can manifest itself in two ways, and both are important. The first is the level of manufacturer's list price increases we obtain. As you might expect, there are (at least) two different views on this issue and most people subscribe strongly to both of them, depending upon the day or hour. One view is that the higher base price level mandated by the settlement or [Federal Excise Tax] will provide an umbrella for higher manufacturer's price increases. The other is that lower industry volume, excess capacity, and the intensely competitive nature of the manufacturers will result in a "price war" that will last until fewer companies are left standing than exist today. The latter view has the benefit of representing a more classical economics viewpoint but appears irrational. The former view, on the other hand, appears a bit starry-eyed. Along with industry volume, it is this issue on which the future rests.

*Id.* at 5009–5010 (noting also "the interesting possibility of big VFM brands that one day in the future will stop growing due to their inability to attract price switchers as there will be relatively few consumers who find the level of savings to be meaningful. While there is some intuitive appeal to this viewpoint, no one can predict where or when such a turning point may occur"). If B & W were a party to a price-fixing scheme, there would be no need to speculate about various theories in the nature of future pricing in the industry. Thus, viewing the totality of evidence before the court, these documents are inconsistent with even the existence of a tacit agreement among Defendants.

### B. *Conscious Parallelism v. Cartel Behavior*

 Significantly, in their presentation of evidence, Plaintiffs have not distinguished conscious parallelism from cartel behavior. Their most significant allegation is of parallel pricing, a factor that alone is insufficient to raise an inference of conspiracy. Plaintiffs argue that "the importance of the pricing itself cannot be overstated" because "Defendants took *identical* price increases at *all price levels* within days or hours." Pls.' Resp., at 76 (emphasis in original). Plaintiffs contend that the "similarity and timing of the price increases themselves" allow Plaintiffs to raise a legitimate inference that there was an agreement among Defendants. *Id.* The law is clear, however, that parallel pricing is not sufficient to establish a price-fixing scheme in an oligopoly.[50]

This requirement is based on economic truths. "[C]ompeting firms may be able to achieve cartel-like results for themselves merely by observing each other's behavior in the market place." Areeda, ¶ 1410b, at 65. In an oligopoly, each "firm's pricing decision is *interdependent* with that of its rivals: each knows that his choice will affect the others, who are likely to respond, and that their responses will affect the profitability of his initial choice." *Id.* (emphasis in original); *see also id.,* ¶ 1429a, at 175. "Interdependent decision-making can produce the same unhappy results as a cartel." *Id.,* ¶ 1429b, at 175. "Oligopolists seem readier to 'compete' in sales promotion or product variation than in price." *Id.,* ¶ 1429c, at 177.

"Oligopolists have no choice but to set a price somehow, and it is hard to see how they can be mandated to ignore their ri-

---

**50.** Plaintiffs cite *American Tobacco Co. v. United States,* 147 F.2d 93, 114 (6th Cir.1944), for this proposition, but the procedural posture of that case was reviewing the guilty verdict rendered by the jury, and thus, the court viewed all possible inferences in favor of the jury's verdict. *Id.* at 101.

vals' prices." *Id.*, ¶ 1420, at 123. "Those buying and selling in a concentrated market are forced by circumstance to observe the pricing practices of their competitors. Each wishes to maximize its profits and does so by anticipating the reactions of competitors to its own decisions. The courts cannot create and administer relief that compels the defendants to ignore the actual and prospective market behavior of their rivals." *Id.*, ¶ 1426d, at 280 (Supp. 2001). "An oligopolist raising his price with knowledge that he will have to retract it if significant rivals do not follow is, in a sense, inviting his rivals to follow. Following the leader is a conscious acceptance of that 'invitation' to the end that market prices will be higher than before.... Nevertheless, tacit price coordination through recognized interdependence was not deemed to be an agreement under § 1." *Id.*, ¶ 1436, at 241.

The case law similarly recognizes that "conscious parallelism" alone cannot support an inference of agreement. Conscious parallelism is

> the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to cut prices usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues.

*Harcros*, 158 F.3d at 570. The court further noted that "consciously parallel behavior by oligopolists does not in itself support an inference of agreement, of 'a meeting of the minds,' any more strongly than it supports an inference of legal price maintenance or leadership." *Id.* at 571. *See also Brooke Group*, 509 U.S. at 227, 113 S.Ct. 2578 (conscious parallelism is "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."); *Clamp–All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir.1988) ("A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-then-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry."). Furthermore, when one firm is substantially larger than the others in an oligopoly, its pricing policies will have more influence on the market. *See In re Baby Food*, 166 F.3d at 128 ("Because Gerber controlled 70% of the market in baby foods and was the acknowledged leader in this industry, Gerber's pricing understandably may have had an influence on its competitors' pricing."). Therefore, it is particularly important to distinguish between parallel pricing and collusive activity in the cigarette industry because there is one firm that carries nearly 50% of the market. *See* Facts, ¶¶ 58–59 (Philip Morris' market share between 42.2% and 49.6 % during period of alleged conspiracy).

■ Plaintiffs' expert does not defer to the legal distinction between conscious parallelism and cartel behavior. Dr. Fisher testified that "facilitating practices" could refer to something that different companies "explicitly agree[d] to do" or "it can also refer to things that firms agree to do without reaching an explicit agreement." Fisher Depo., at 265. He further testified that certain practices could be facilitating, but would be acts the firm would take regardless because they were in the economic self-interest of the firm. *Id.* at 271. Thus, Dr. Fisher cannot state

that what he labels a "facilitating practice" would distinguish between conscious parallelism and cartel behavior.

Dr. Fisher's testimony illustrates the breadth of his terminology and the fact he recognizes that what he labels "facilitating practices" might not be unlawful conduct:

Q: . . .

I understand that you have expressed the opinion that there are certain practices you call facilitating practices here, correct?

A: Yes.

Q: And within your definition of anti-competitive acts, you believe that these practices are anticompetitive acts, correct?

A: Yes.

Q: Based on your understanding of the law, that doesn't make them illegal necessarily, correct?

A: Yes.

MR. REINHARDT: I object as calling for a legal conclusion.

Q: But as you define anticompetitive practices which includes anything that can only be explained by a desire to obtain supercompetitive profits, these are anticompetitive acts, correct?

A: Yes.

Q: And you concede that your definition of anticompetitive acts includes what you term as purely conscious parallelism?

A: Yes.

Q: So that your definition of anticompetitive act does not distinguish for us those actions that are purely conscious parallelism from those that are beyond purely conscious parallelism, correct?

A: That's true.

*Id.* at 305–06. Dr. Fisher then expresses his opinion that "there are real problems with rules against conscious parallelism. They are unintended consequences and you can't prevent it, but that doesn't mean there are unintended consequences and you can't prevent facilitating—certain kinds of facilitating actions designed to protect conscious parallelism." *Id.* at 307. The failure of Plaintiffs' expert to distinguish conscious parallelism from cartel behavior makes his subsequent opinion inadmissible as he finds inferences of collusion where the law finds none. Dr. Fisher is positing a new theory where certain aspects of conscious parallelism should be found to be anticompetitive. This is not the state of the law. This meshing of two terms is particularly troubling when the hallmark of a "plus factor" under the law is that it tends to exclude the possibility that the defendant was engaged in mere conscious parallelism.

 Defendants also point out that the findings of Plaintiffs' expert at one point was inconclusive on the specific issue of whether Defendants engaged in collusive behavior.[51] Dr. Fisher stated: "The actions of the leading cigarette firms have gone beyond the bounds of simple conscious parallelism or independent economic self-interest. The industry's actions exhibit, at the very least, practices that facilitate tacit price coordination and may even embrace explicit price coordination." Fisher Report, ¶ 145; *see also* Fisher Rebuttal Report, ¶ 5 ("I assert that defendants engaged in a pattern of conduct that is, in most instances, consistent with loose, im-

---

51. When asked at his deposition whether he could "identify any prior price fixing case in which [he has] not given a definitive opinion one way or another as to the presence of actual collusion or an explicit agreement," Dr. Fisher could only name one other case. Fisher Depo., at 410–11.

perfect coordination."). At oral argument, Plaintiffs' counsel asserted that Dr. Fisher was a bit more decisive in his "addendum" affidavit. There, Dr. Fisher stated:

> I characterize the behavior that I have observed in the cigarette industry during the relevant period as a "collusive oligopoly" or a "loose cartel." I believe that the cigarette companies have engaged in activities beyond mere conscious parallelism, and indeed have participated in various facilitating practices that are anticompetitive in purpose and effect.

Fisher Addendum, ¶ 5. Because of his flawed view of the law, this testimony is inadmissible. As the court has discussed above, "facilitating practices" may not rise to the level of what the law requires in "plus factors"—actions that tend to exclude the possibility of lawful action. Dr. Fisher's testimony does not explain how these "facilitating practices" exclude the possibility of lawful action. Moreover, as the court previously explained, Dr. Fisher's allegations of "anticompetitive" conduct are broad and could be read to include lawful activity.[52]

Defendants correctly note that Dr. Fisher's "addendum" was filed out of time. Dr. Fisher's "addendum" is dated February 7, 2002, and there is no certificate of service in the record to clarify when the document was served on Defendants. In an order dated September 5, 2001, based on the parties' agreement and proposed consent order, the court ordered that Plaintiffs' reply expert reports are due on January 28, 2002, and all expert discovery is to close on that date. *See* September 5,

2001, Order, at 2. For this reason, too, Dr. Fisher's addendum is rejected.

## C. Practical Economic Sense of Alleged Conspiracy

Defendants contend that Plaintiffs' theory does not make practical sense, *see Matsushita*, 475 U.S. at 597, 106 S.Ct. 1348, because during the alleged conspiracy Defendants "(1) took price increases at a slower pace and in smaller amounts than before the conspiracy, (2) spent billions of dollars competing with each other on price and other dimensions at retail; and (3) . . . experienced substantial market share shifts, with some defendants gaining at the expense of the other alleged conspirators." PM, Opening Brief, at 25.

### 1. Prices After Marlboro Friday

Defendants contend that allegations of a conspiracy from 1993 to 2000 do not make economic sense because prices rose less rapidly after Marlboro Friday than before. For the two years preceding Marlboro Friday, Defendants' wholesale list ·prices for premium cigarettes increased on average $7.80 per thousand per year. Fisher Report, Ex. 3, at 1; Facts, ¶ 27. For the four years following Marlboro Friday, Defendants' wholesale list prices for premium cigarettes increased on average $2.00 per thousand per year. Fisher Report, Ex. 3, at 1–4; Facts, ¶ 28. The wholesale list prices of premium.brands did not exceed pre-Marlboro Friday levels until the price increases of August 3, 1998, nearly five years after the alleged conspiracy began. Elzinga Report, Ex. 7; Facts, ¶ 29. When adjusted for inflation, settlement

---

**52.** The assertions of Dr. Fisher's opinion alone are not sufficient to withstand a motion for summary judgment. *See In re Citric Acid,* 191 F.3d at 1105 n. 9 (rejecting plaintiff's claim that the reports of its expert economist "mandate the denial of [defendant's] summary judgment motion" and finding that the court considered the evidence discussed by the expert and determined that "no piece of evidence tends to exclude the possibility that [defendant] acted independently and is not affected by the conclusory statements in the expert report to the contrary") (citing *Brooke Group,* 509 U.S. at 242, 113 S.Ct. 2578).

costs, and federal excise taxes, the whole-sale list price for premium brands did not exceed the pre-Marlboro Friday levels until August 1999. Facts, ¶ 34. *See also* Fisher Depo., at 96–115 (testifying there were more price increases before Marlboro Friday than after; pre-Marlboro Friday price increases were larger than the price increases from 1993 to 1998). Defendants assert that "if one simply projected manufacturer list prices from the pre-cartel period forward, making appropriate adjustment for M.S.A./Pittsburgh costs, the projected list prices would be *higher* than the list prices for Marlboro actually were during the alleged cartel period." Elzinga Report, at 38, Exhs. 7 and 8 (emphasis in original).

Plaintiffs respond that this is a "straw-man" argument because prices were drastically reduced on Marlboro Friday. During the conspiracy, Plaintiffs contend, prices rose monotonically through February 2000. Plaintiffs, however, offer no econometric testimony specifically as to what prices should have been without a conspiracy. Thus, Defendants have proffered unrefuted expert testimony that projecting from the pre-cartel prices forward, one would have expected prices to be higher than they were during the alleged cartel period.

During oral arguments on the parties' motions for summary judgment, Plaintiffs also argued that Defendants' comparisons are inappropriate because the prices of cigarettes prior to Marlboro Friday were "supracompetitive," that is, they were higher than the market would continue to support, and thus, it is no surprise that prices had to drop. *See* Oral Argument, at 65. Defendants respond that the Supreme Court has rejected this argument in two forms. First, Defendants argue that Plaintiffs' assertion is akin to an argument that Defendants agreed to lower prices on Marlboro Friday so that they could raise

them again during the conspiracy to recoup income lost as a result of the drastic price-cutting on Marlboro Friday. In *Matsushita*, Defendants aver, the Court declined to infer existence of an alleged predatory price conspiracy that would depend on the defendants' ability to recoup 15 years of artificially-depressed prices. *See* 475 U.S. at 595–97, 106 S.Ct. 1348. Second, Defendants argue in *Brooke Group*, the Supreme Court specifically held that antitrust law should not "punish" competitive acts of reducing prices:

> Even in an oligopolistic market, when a firm drops its prices to a competitive level to demonstrate to a maverick the unprofitability of straying from the group, it would be illogical to condemn the price cut: The antitrust laws then would be an obstacle to the chain of events most conducive to a breakdown of oligopoly pricing and the onset of competition. Even if the ultimate effect of the cut is to induce or reestablish supracompetitive pricing, discouraging a price cut and forcing firms to maintain supracompetitive prices, thus depriving consumers of the benefits of lower prices in the interim, does not constitute sound antitrust policy.

*See* 509 U.S. at 223–24, 113 S.Ct. 2578. This analysis is significant in its similarity to what Philip Morris achieved unilaterally with Marlboro Friday.

Even accepting Plaintiffs' argument that Marlboro Friday is an improper comparison point, Defendants have demonstrated that prices rose at a lesser rate during the alleged conspiracy period than during the period from 1988 to 1993, which Plaintiffs contend is a period of competitive pricing in the cigarette industry. *See* DeMario Ex. Cl. Developing a trend line from the reduced Marlboro Friday prices from November 1993 through February 2000, one would expect a Marlboro list price of

$53.26 per thousand, which exceeds the $49.56 actual price. *See* Marlboro List Prices Adjusted for Federal Excise Taxes, Inflation and Ongoing Resolution Costs—Linear Pricing Trends, Philip Morris Argument Binder Oral Argument on Motions for Summary Judgment, Tab 42. If the prices after Marlboro Friday had been increased at the same percentage rate during the alleged conspiracy as before the alleged conspiracy, the Marlboro list price would have been $64.35 per thousand. *See id.,* Tab 43.

Dr. Fisher also testified that he would have expected prices to rise after Marlboro Friday.

A: After '93, there were various events affecting the cigarette industry. There were changes in taxes and there were settlement costs from the various health cases. Each of those—as I recall, every one of those, but at least the ones I remember, had the property that they raised the marginal cost of cigarette, of the cigarette business.

As a general rule, one would expect that when that happened, it would be in the individual self-interest of each company to raise its price. Whether it was in their individual self-interest to raise their price to the extent they did and to follow exactly other people's price, that is a different question. But the prices would go up, that is a natural outcome of what was going on. That's the first part of it.

Q: Are you saying that you are sure prices would have gone up, but you are not sure they would have gone up or should have gone up as much as they did? Is that what you are saying?

A: By the amount they did in the exact timing they did or for the same extent for everybody.

Q: Have you attempted to estimate how much you think prices would have gone up in an industry with a structure of the cigarette industry without price coordination?

. . . . .

A: . . . [T]he answer to that is partly yes and partly no. . . . The answer to that is mostly no in the sense that I have not made an econometric study or empirical investigation of how much. On the other hand, I have given some thought to what are the factors that one would have to know about.

Fisher Depo., at 52–54; at 109 (testifying only that prices for premium cigarettes "probably" would have increased less after Marlboro Friday in absence of price coordination). Neither Dr. Fisher, nor any other expert, however, made findings as to what they thought cigarette prices "should have" been absent a conspiracy. *See also Reserve Supply,* 971 F.2d at 52 (rejecting plaintiff's claim that defendants gained supracompetitive profits where plaintiff offered "no evidence, such as studies on the comparative costs of production or on market conditions, to indicate that these profits were above those available in a competitive market"). In sum, Defendants argue that if there had been a conspiracy, prices should have risen at a faster rate than during a competitive period. Defendants have demonstrated that they rose at a slower rate which contradicts a theory of conspiracy.

### 2. *Wholesale v. Retail Prices*

Defendants next contend that a theory of conspiracy is illogical because Defendants engaged in substantial competition at the retail level. Dr. Elzinga opines that "cartels are economically plausible only to the extent they influence the prices manufacturers actually 'take home.'" Elzinga

Report, at 21. Dr. Elzinga asserts that the substantial amount of competition at the retail level makes Plaintiffs' cartel theory implausible because (1) it would be "irrational" for the companies to spend this much money on retail competition if prices were fixed, and (2) the value of the cartel would be doubtful when companies like Philip Morris, for example, are permitted "to engage in such extensive price competition designed to draw smokers to the Marlboro brand and away from" the brands of the other companies. *Id.* at 25. There is also legal support for this analysis. In discussing the cigarette industry, the Supreme Court noted there is

> undisputed evidence that ... list prices were not the actual prices paid by consumers .... Especially in an oligopoly setting, in which price competition is most likely to take place through less observable and less regular means than list prices, it would be unreasonable to draw conclusions about the existence of tacit coordination or supracompetitive pricing from data that reflects only list prices.

*Brooke Group,* 509 U.S. at 235–36, 113 S.Ct. 2578; *see also Reserve Supply,* 971 F.2d at 53–54 (a system of fixed list prices "would be, to put it mildly, an awkward facilitator of price collusion because the industry practice of providing discounts to individual customers ensured that list price did not reflect the actual transaction price"); *In re Baby Food,* 166 F.3d at 128 ("In an industry with hundreds of products and a pervasive policy of allowing discounts and promotional allowances to purchasers, allowances that varied even to the same customer if it conducted business in different geographical areas, charts and reports focusing on *list prices* rather than

*transactional prices* have little value.") (emphasis in original).

It has been likewise established here that through promotional expenditures, retail transactional prices varied for cigarettes even among brands identically priced at wholesale list. Facts, ¶ 73. From 1993 to 2000, Defendants used promotions that directly reduced the prices paid by consumers at retail. *Id.,* ¶ 62. Retail discounts in the cigarette industry include (1) buydowns, direct reimbursements to retailers for reducing price on promoted brands,[53] (2) "buysomes" where a manufacturer offers a buy-some-get-some-free promotion, or (3) coupons, effectuating price reductions. *Id.;* Elzinga Report, at 21. According to the Federal Trade Commission, the cigarette manufacturers spent the following amounts on promotional allowances, coupons, and retail value added:

| Year | Cigarette Promotional Expenditures |
| --- | --- |
| 1994 | $ 2.928 billion |
| 1995 | $ 3.214 billion |
| 1996 | $ 3.460 billion |
| 1997 | $ 3.961 billion |
| 1998 | $ 5.059 billion |
| 1999 | $ 6.634 billion |

Facts, ¶ 65. Philip Morris' expenditures on retail promotions, couponing, and its retailer incentive program increased from $1.268 billion in 1994 to $2.919 billion in 1999. *Id.,* ¶ 66. Philip Morris alone spent $13.8 billion on retail promotion during the time of the alleged conspiracy from 1994 to 2000. *See* Elzinga Report, at 49. Similarly, RJR's increased from $1.24 billion in 1993 to $1.81 billion in 1999. Facts, ¶ 68. RJR's retail promotional spending in 1999 was 141.96 % of its operating income. *Id.,* ¶ 69. Lorillard's promotional spending increased from approximately $205 million in

---

**53.** A "buydown" is a "discount in the form of an allowance offered to a retailer. The allowance is conditioned on the retailer dropping the non-promoted price of cigarettes by at least the amount of the buydown." Elzinga Report, at 6.

1993 to approximately $456 million in 1999. *Id.*, ¶ 71. In 1993, B & W spent $606 million on retail price discounting and promotional spending. By 1998, B & W spent more than $1 billion in these areas, almost one-quarter of the company's revenue for that year. *Id.*, ¶ 70.

Plaintiffs devote substantial argument to asserting that competition at retail does not mean that Defendants are not fixing prices at wholesale. *See* Pls.' Resp., at 80–85. For example, Plaintiffs argue that Defendants ignore the *per se* rule and cannot contend they should not be liable for the conspiracy because of their retail competition. This misses the mark. Defendants do not assert they should not be held liable because of retail competition, but rather argue that the high level of competition at retail shows that it would not make economic sense for Defendants to fix prices at wholesale while maintaining vigorous competition at retail.[54]

Plaintiffs contend that (1) because Defendants' profits increased during the conspiracy, it is irrelevant that they were spending money on promotional activities, (2) Defendants' spending at retail was not for competitive purposes, (3) retail price promotions are inferior to wholesale list price changes, and (4) Defendants' assertion that retail promotions are the only way to pass through pricing to consumers is unsupported.[55]

Dr. Fisher testified that in the three years after the start of the conspiracy, industry revenue increased more than $1.38 billion while promotional expenses increased only $532 million. *See* Fisher Rebuttal, ¶¶ 17–18. Dr. Fisher, however, does not agree that profitability is the proper measurement of the plausibility of a conspiracy. In his deposition, Dr. Fisher testified that

> I am the author of some articles on ... the question of whether you can use profits to infer very much.... And what those article say—and I remain, if I may say so, both committed to this, and rather forcefully committed to this. What the articles say is that you cannot use accounting profits to infer economic profits, and you certainly can't use them to infer that there are monopoly profits, and that attempts to do this are going to almost always end in failure.

Fisher Depo., at 509–10.

Furthermore, from 1996 to 1999, RJR spent $ 5.6 billion on promotional programs. *See* Blynn Aff., ¶ 3. This exceeds the $3.2 billion Plaintiffs' damages expert claims that RJR overcharged during the conspiracy period. Similarly, during the time of the alleged conspiracy, Defendants spent a combined $25.256 billion on promotional allowances, coupons, and retail value added. Facts, ¶ 65. This exceeds $13 to $15 billion, the total amount Plaintiffs allege Defendants overcharged during the alleged conspiracy period. Thus, Plaintiffs' claim that Defendants recouped through the conspiracy any losses on in-

---

**54.** Plaintiffs offer no support for their assertion that "the issue of whether the existence and level of retail competition impacts the determination of liability for price-fixing at the wholesale level is one for the finder of fact." Pls.' Resp., at 84. Rather, Defendants are permitted to rebut Plaintiffs' contentions with evidence of their own. *See Todorov,* 921 F.2d at 1456 n. 30.

Nor does the court find relevant Plaintiffs' citation to a document purporting to discuss strategy between Philip Morris International and BAT in Chile. As the court described above, Plaintiffs have not established the necessary predicate for the court to consider this document, even under Rule 404(b).

**55.** The court has addressed above the issue of whether wholesalers will tend to increase the price of all manufacturers' brands when one announces a price increase.

creased promotional spending at retail is without force.

The fact that, as Plaintiffs allege, retail price promotions are not as "efficient" as wholesale list price changes, is irrelevant to whether it would make sense for Defendants to compete at the retail level and agree to fix prices at the wholesale level. Even Plaintiffs' own expert seems to take issue with that position.

Q: ... I am facing ways of deploying money to move share, and do you have a view as to the relative efficiency of various ways of deploying that money to move share?

A: If I were to answer that question literally, the answer would be no .... I don't mean to suggest that retail promotions are a useless way to do this, nor on the other hand do I believe that resisting following at wholesale is a useless way of doing this either.

Q: But in terms of the relative efficiency of one versus the other, you are not prepared to judge that as you sit here today, correct?

A: Correct.

Fisher Depo., at 501. Furthermore, Defendants never claim that competing at retail is "economically superior to list price competition." Pls.' Resp., at 91. Defendants simply assert that it is illogical to argue that Defendants have fixed prices when their spending on promotional expenses exceeds that which Plaintiffs claim has been overcharged. Accordingly, the court finds persuasive Defendants' argument that Plaintiffs' theory of conspiracy does not make economic sense in light of the high level of spending on competition at the retail level.

### 3. Changing Market Shares

Defendants argue that the shifts in market shares that occurred among the companies are inconsistent with cartel activity. The following market share changes occurred between 1993 and 2000 in the cigarette industry:

| Company | 1993 | 1999 | 2000 |
|---|---|---|---|
| Philip Morris | 42.2% | 49.6% | 50.5% |
| RJR | 30.6% | 23.0%· | 23.0% |
| B & W | 16.6% [56] | 13.4% | 11.7% |
| Lorillard | 7.1% | 10.4% | 9.6% |
| Liggett | 2.4% | 1.3% | 1.5% |
| All Others | ----- | 2.3% | 3.7% |

Facts, ¶¶ 58–60. Philip Morris' market share increased 17.5%, Lorillard's increased 46.5%, RJR's decreased 24.8%, and B & W's decreased 19.3%.

Defendants contend that it does not make sense that RJR and B & W would agree to and continue in a conspiracy where they continued to lose significant market share. *See* Elzinga Report, at 42 ("the stability of the conspiracy generally requires that cartelists' market shares remain stable"). Dr. Elzinga recognizes that a cartel might shift market shares in order to prevent detection or to appease a disgruntled cartel member, but there would have to be some way to control the redistribution under those circumstances. *See id.* Dr. Elzinga opines, however, that in the cigarette industry, market shares have changed too much for either of these scenarios to be present. *Id.* Philip Morris and Lorillard have gained market share, while B & W and RJR have lost share. The share of "other manufacturers," new entrants to the market, has also grown since 1996.

Plaintiffs recognize that Philip Morris and Lorillard gained market share during the alleged conspiracy while RJR and B &

---

**56.** The market share figures include those for most of the brands of the American Tobacco Co. acquired by B & W in 1994.

W lost share. In response to this, however, Plaintiffs' expert testifies that "near constancy of shares is not likely to characterize collusive arrangements in the context of changing market conditions." Fisher Rebuttal, ¶¶ 22–23. To show that market shares stabilized after Marlboro Friday, Dr. Fisher relies on data reflecting monthly shipments to wholesalers. *See* Fisher Rebuttal, Exs. 1 & 5. But monthly shipments to wholesalers does not reflect what share of the market each Defendant had because it does not consider the percentage of sales each Defendant made to consumers, but rather what shipments were made to wholesalers. Defendants contend that it is inappropriate to consider market share changes on a monthly, as opposed to annual, basis because monthly basis shifts are affected by whether customers are "loading up" on a particular brand of cigarette. *See* Oral Argument, at 17; Defendants' Joint Post–Argument Reply Memorandum in Support of Their Motions for Summary Judgment, at 7.

Exhibit 13 to Dr. Elzinga's Report shows the year-by-year market share changes in the industry from 1986 to 2000. Over this time, Philip Morris' market share increased 17.5%, Lorillard's increased 46.5%, while RJR's decreased 24.8% and B & W's decreased 19.3%. *See* Fisher Depo., at 172–73 (testifying that a one percent shift in market share would have a "substantial impact on the revenue" of companies). This exhibit clearly shows that there were dramatic "winners and losers" during the alleged conspiracy period, a fact that is inconsistent with cartel behavior. *See also In re Baby Food,* 166 F.3d at 137 ("It is inconceivable that with losses running at least 10% for every case sold, Nestlé would have remained a party to a conspiracy to fix prices, preserve Gerber's market share year after year, and run up its own losses."); *Citric Acid,* 191 F.3d at 1102–03.

Even if the court were to consider the monthly shipping data, Dr. Fisher's exhibits demonstrate only that Defendants' permanent allocation programs were achieving their desired goal of stabilizing inventory shifts month-by-month by preventing "trade loading." As Defendants argue, each company's monthly shipment patterns became more regular as each implemented an allocation program. *See* Defendants' Joint Post–Argument Reply Memorandum, at 7 (citing Fisher Rebuttal Ex. 5 and noting that "RJR's shipment patterns smoothed" after they eliminated trade loading in 1989, Lorillard's in 1990, and Philip Morris' and B & W's in 1993).

Plaintiffs contend that the market share shifts would have been much more dramatic without the collusive agreement among Defendants. *See* Fisher Rebuttal, Ex. 1; Oral Argument, at 88, 91, 93–94 (commenting on RJR's declining market share and stating, "I suggest to the court that if this industry hadn't gotten some price—back in place that would have continued and RJR and I suspect Brown & Williamson might likely be completely off the chart, they would have just disappeared, become part of Liggett or something"). But Plaintiffs offer no evidence, other than Plaintiffs' counsel's rumination, for their contention that B & W and RJR agreed to the conspiracy in order to slow their rates of decline and allow them to "hang on" a few more years in the industry.

## V. CONCLUSION

The court finds that the evidence adduced by Plaintiffs does not singularly or in combination exclude the possibility that Defendants acted independently, as required by *Matsushita*. Even under the more standard summary judgment analysis, the inferences urged in support of Plaintiffs' theory of conspiracy require either that the jury merely guess between

lawful and unlawful activity or are the product of flawed logic. Finally, when the court looks at the case as a whole, the contemporaneous documents show Defendants operated under substantial uncertainty about each other's future pricing actions and are, thus, wholly inconsistent with a settled agreement to fix prices. At the same time, the amount of competition at the retail level forced Defendants to spend more in pro-competitive acts at retail than Plaintiffs contend Defendants gained at wholesale. Under these circumstances, the court finds that no reasonable jury could conclude that the activities in the cigarette industry during the relevant time frame reflect a conspiracy to fix prices.

Accordingly, the court GRANTS Defendant R.J. Reynolds' motion for summary judgment [170–1]; GRANTS Defendant Brown & Williamson's motion for summary judgment [171–1]; GRANTS Defendant Lorillard Tobacco Company's motion for summary judgment [173–1]; and GRANTS Defendant Philip Morris' motion for summary judgment [174–1].

In preparing this order, it came to the court's attention that Plaintiffs' Response to Defendants' Motions for Summary Judgment [180–1] was filed under seal. That document is ordered unsealed instanter. The court is of the opinion that anything submitted to the court and which the court relied on in ruling on the motions for summary judgment ought to be unsealed. The Clerk of the Court is DIRECTED in twenty days from the date of this order to UNSEAL all depositions and documents filed in support or opposition to Defendants' motions for summary judgment unless a party files a motion to keep some particular document or deposition sealed for a competitive or other unique circumstance. Open courts of record are grounded in the democratic process. This is a case of some importance and the public

ought to know what information was before the court as the court made its decision.

During the last months of this case, Plaintiffs' counsel became engaged in a heated dispute which primarily centered around administrative issues of fee and expense allocations, but also contained suggestions that some members of the Plaintiffs' Management Committee were inattentive or ill-prepared. The court submitted the issues to a Special Master who determined that while the conduct was not professional, the class was vigorously represented during the conduct of the litigation.